**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

FILED BY _____ D.C.

05 JUN 23 AM II·5?

ROBERT R. DI ~~OLIO~~
CLERK, U.S. DIST. CT.
~~W.D. OF TN, MEMPHIS~~

|  |  |
|---|---|
| **GAILE K. OWENS,** | ) |
| Petitioner, | ) |
|  | ) |
| v. | )   No. **2:00-2765**-Br |
|  | ) |
| **EARLINE  GUIDA**, WARDEN, | ) |
| Tennessee Prison For Women, | ) |
|  | ) |
| Respondent. | ) |
|  | ) |

---

## ORDER GRANTING IN PART RESPONDENT'S FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT

---

The Petitioner, Gaile K. Owens, an inmate at the Tennessee Prison For Women in Nashville, Tennessee, filed an application for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the jury's imposition of a sentence of death for the crime of accessory before the fact to first degree murder.[1] The Respondent, Earline Guida, warden at the prison, filed a motion for summary judgment asserting that Petitioner's claims are procedurally defaulted and/or are without merit. The Court will address each of

---

[1]    Petitioner does not dispute her conviction for the offense of accessory before the fact to first degree murder. In the instant petition for writ of habeas corpus relief, she only challenges the sentence of death imposed for the offense.

1

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on *6-23-05*

78

Petitioner's claims individually[2].

## I.   **FACTUAL BACKGROUND**

In 1986, Petitioner was tried in a Tennessee state court for the murder of her husband, Ronald Owens.[3]   The jury convicted her of accessory before the fact to first degree murder for which she received a sentence of death.   State v. Porterfield, 746 S.W.2d 441, 443-444 (Tenn. 1988).

The evidence at trial established that prior to Mr. Owens' murder, over the course of several months, Petitioner solicited several men, including Sidney Porterfield and George James, to kill her husband.   Id. at 444.   Porterfield was eventually hired by Owens to kill her husband.   She met with Porterfield on at least three occasions, the last being at 2:30 pm on Sunday, February 17, 1985.   Id.   At that meeting, Petitioner told Porterfield that her husband would either be at home alone or at the church playing basketball on Sunday evening.   Porterfield attacked the deceased at his home, on the evening of February 17, 1985, striking him over the head more than twenty-one times with a blunt object.   Id.

On the same evening as the murder, Mr. and Mrs. Owens and

---

[2]      The warden's motion for summary judgment as to Claims 19 and 21, ¶ 177, is substantially affected by recent rulings of the United States Court of Appeals for the Sixth Circuit and the United States Supreme Court in Cone v. Bell, 359 F.3d 785 (6th Cir. 2004) rev'd __ U.S. __ (2005), 125 S.Ct. 847 (per curiam), and is addressed in a previous order entered by the Court.   See Owens v. Guida, case no. 00-2765, Order Granting In Part Respondent's First Motion For Partial Summary Judgment And Denying Petitioner's Motion For Partial Summary Judgment, dkt. no. 77, March 24, 2005 ("Owens Order I").

[3]      Petitioner was tried jointly with co-defendant Sidney Porterfield.

2

their two sons attended church services.  After church, when Mr. Owens remained to play basketball, the children asked to stay and play as they usually did.  Mrs. Owens refused to let them stay, however, and took them instead to a restaurant for dinner and then to the home of her sister, Carolyn Hensley.  They remained there until approximately 10:30 pm at which time they went home.  Id.

Upon arriving at the home around 11:00 pm, the Petitioner and her children found Mr. Owens' unoccupied car in the driveway with the door open.  The back door to the house was likewise partially open, and Mr. Owens' keys were in the lock.  In the kitchen, there were signs of a struggle, and blood was splattered on the wall and floor.  The boys and Petitioner discovered Mr. Owens lying in the den unconscious with blood covering his head.  Id.

After the murder, James contacted the police and told them that the Petitioner had solicited him to kill Mr. Owens.  James then assisted the police by contacting and eventually meeting with her.  In their conversation, Mrs. Owens told James, who was wearing a hidden tape recorder, that she had her husband killed because of "bad marital problems."  In order to keep him quiet, the Petitioner paid James sixty dollars.  At the conclusion of the meeting, the police arrested Mrs. Owens.  Id.

Initially, Petitioner told the police that she had only hired people to rough up her husband.  Later, she confessed to offering three men money to kill him.  When asked by the police why she had

3

him killed, Petitioner stated, "[W]e've just had a bad marriage over the years, and I just felt like he had, mentally I just felt like he had been cruel to me.   There was very little physical violence."  Id.

The police also arrested Porterfield, who confirmed that he had met with the Petitioner and that she had offered to pay him $17,000 to kill her husband.   He admitted getting into an altercation with the deceased, at which time Porterfield hit Mr. Owens in the head with a tire iron multiple times.   Porterfield maintained, however, that he was at the home solely to check out the situation, that the deal with Petitioner was not completed, and that he struck the victim only to prevent him from turning Porterfield over to the police.  Id. at 445.

Petitioner did not testify at trial.   In her defense, Mrs. Owens presented the testimony of a neighbor who testified as to Petitioner's mental state upon finding her husband, and a funeral home employee who stated that Petitioner owed money for the deceased's funeral bill, as she had represented to her father-in-law in attempting to secure a loan after her husband's death. Presumably, Mrs. Owens offered this testimony to show that she had legitimate debts to pay, rather than requiring money to supplement or replenish the money she had allegedly spent in procuring her husband's murder.  Id.

On January 14, 1986, the jury found Petitioner guilty of

4

accessory before the fact to first degree murder and Porterfield guilty of first degree murder. At the sentencing hearing, Mrs. Owens called as witnesses Dr. Max West, a psychiatrist who had examined her on one occasion years earlier, and two jail employees, one of whom was Elizabeth Bratcher. Id. at 448; Add. 4, vol. 13 at 1902-1911. Despite the mitigation evidence presented by Mrs. Owens, the jury sentenced her to death. In support of the sentence, the jury found the existence of two of the statutory aggravating factors: 1) Petitioner committed the murder for remuneration or the promise of remuneration, or employed another to commit the murder for remuneration, or the promise of remuneration; and 2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Porterfield, 746 S.W.2d at 448-449; Tenn. Code Ann. § 39-2-203(i)(4 & 5)(1982).

## II.   PROCEDURAL BACKGROUND

Petitioner appealed her conviction and sentence asserting various grounds for relief.[4] The Tennessee Supreme Court affirmed Owens' conviction and sentence in State v. Porterfield, 746 S.W.2d 441 (Tenn. 1988), and the United States Supreme Court denied her

---

[4]        On direct appeal, Owens asserted error based on 1) the trial court's refusal to sever Petitioner's case from Porterfield's, 2) the trial court's ruling that Petitioner could not present evidence of her willingness to plead guilty in return for a life sentence, 3) the trial court's rulings during voir dire, 4) the trial court's admission of certain evidence, including the introduction at the sentencing hearing of two photographs of the victim, 5) the State's failure to give the required notice of the aggravating circumstances it intended to rely upon during the sentencing phase, 6) arguments made by the State to the jury, 7) the guilt and sentencing instructions given to the jury; and 8) the constitutionality of the sentencing provisions of the Tennessee Death Penalty Act, Tenn. Code Ann. § 39-2-203.

subsequent petition for writ of certiorari.  See Porterfield v. Tennessee, 486 U.S. 1017 (1988).

On February 28, 1991, Owens filed a petition for post-conviction relief which was denied and included an ex parte request for expert services.  On interlocutory appeal to the Tennessee Supreme Court, Petitioner was granted the funds for expert services.  See Owens v. State, 908 S.W.2d 923 (Tenn. 1995).  She then filed an amended post-conviction petition on August 15, 1996, which was also denied.  The Tennessee Court of Criminal Appeals affirmed the denial, see Owens v. State, 13 S.W.3d 742 (Tenn. Crim. App. 1999),[5] and the Tennessee Supreme Court refused to consider Petitioner's application for appeal.  On August 23, 2000, Owens filed the instant petition for writ of habeas corpus.

## III. LEGAL STANDARDS APPLICABLE TO HABEAS PETITIONS

### A. Waiver and Procedural Default

Twenty-eight U.S.C. § 2254(b) states, in pertinent part:

(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

---

[5]     Among the issues raised in the Tennessee Court of Criminal Appeals were whether 1) Petitioner received ineffective assistance of counsel at trial; 2) the post-conviction judge should have recused himself; 3) Petitioner's constitutional rights were violated during the guilt and sentencing phases by the prosecution's failure to provide the defense with exculpatory evidence; 4) the heinous, atrocious, and cruel aggravator was appropriately applied vicariously to Petitioner and whether the trial court should have instructed the jury that Petitioner had to intend to inflict the heinous, atrocious, and cruel act; 5) the murder for remuneration aggravator sufficiently narrowed the class of death eligible offenders; 6) the reasonable doubt jury instructions given at both stages of the  trial were constitutional; and 7) the Tennessee death penalty statute is constitutional.

6

(A)   the applicant has exhausted the remedies available in the courts of the State;   or

(B)   (i)   there is an absence of available State corrective process;   or

(ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.

(2)   An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

Thus, a habeas petitioner must first exhaust available state remedies before requesting relief under § 2254.   See e.g., Granberry v. Greer, 481 U.S. 129, 133-34 (1987); Rose v. Lundy, 455 U.S. 509, 519 (1982); Rule 4, Rules Governing Section 2254 Cases in the United States District Courts.   A petitioner has failed to exhaust her available state remedies if she has the opportunity to raise her claim by any available state procedure.   28 U.S.C. § 2254(c); Preiser v. Rodriguez, 411 U.S. 475, 477, 489-90 (1973).

To exhaust her state remedies, the petitioner must have presented the very issue on which she seeks relief from the federal courts to the courts of the state that she claims is wrongfully confining her.   Picard v. Connor, 404 U.S. 270, 275-76 (1971); Rust v. Zent, 17 F.3d 155, 160 (6th Cir. 1994).   "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief."   Gray v. Netherland, 518 U.S. 152, 162-63 (1996).   "'[T]he substance of a federal habeas corpus

7

claim must first be presented to the state courts.'" Id. at 163 (quoting Picard, 404 U.S. at 278). A habeas petitioner does not satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) "by presenting the state courts only with the facts necessary to state a claim for relief." Id.

In addition, "[i]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." Id. A state defendant may be deemed to have "fairly presented" a claim to the state courts if she (1) relied upon federal cases employing constitutional analysis; (2) relied upon state cases employing federal constitutional analysis; (3) phrased the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleged facts well within the mainstream of constitutional law. Franklin v. Rose, 811 F.2d 322, 326 (6th Cir. 1987). When a petitioner raises different factual issues under the same legal theory, she is required to present each factual claim to the highest state court in order to exhaust her state remedies. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987). A petitioner has not exhausted her state remedies if she has merely presented a particular legal theory to the courts without presenting each factual claim. Pillette, 824 F.2d at 497-98. Each claim must be presented to the state courts

8

as a matter of federal law. "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6 (1982); see also Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curiam) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

Moreover, the state court decision must rest primarily on federal law. Coleman v. Thompson, 501 U.S. 722, 734-35 (1991). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred by this procedural default from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977). "Procedural default does not bar consideration[,] [however,] of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989) (citations and internal quotations omitted). Furthermore, the state-court decision need not explicitly address the federal claims; instead, it is enough that the petitioner's brief squarely

presents the issue.  Smith v. Digmon, 434 U.S. 332 (1978) (per curiam).

When a petitioner's claims have never been actually presented to the state courts but a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted, but procedurally barred.  Coleman, 501 U.S. at 752-53; Teague v. Lane, 489 U.S. 288, 297-99 (1989); Wainwright, 433 U.S. at 87-88; Rust, 17 F.3d at 160.

A petitioner confronted with either variety of procedural default must show cause for the default and prejudice to obtain federal court review of his claim.  Teague, 489 U.S. at 297-99; Wainwright, 433 U.S. at 87-88.  Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule.  Coleman, 501 U.S. at 752-53; Murray v. Carrier, 477 U.S. 478, 488 (1986).

An ineffective assistance of counsel claim may establish cause for the procedural default.  Edwards v. Carpenter, 529 U.S. 446, 453 (2000).  The ineffective assistance of counsel claim relied upon to establish cause, however, must not have been procedurally defaulted.  Id.  If the ineffective assistance of counsel claim was procedurally defaulted, the default may also be excused if the defendant can establish cause and prejudice as to that claim.  Id.

A petitioner may avoid the procedural bar, and the necessity

10

of showing cause and prejudice, by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. The petitioner must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995) (quoting <u>Murray</u>, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted [her] in the light of the new evidence." <u>Id.</u>

Tennessee's post-conviction statute, the Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122, specifies types of procedural default that may bar a state court from reviewing the merits of a constitutional claim. A one-year statute of limitations governs the filing of petitions under that statute. <u>Id.</u> at § 40-30-102. The Sixth Circuit has upheld the dismissal of a Tennessee prisoner's habeas petition as barred by a procedural default caused by failing to file within the Tennessee statute of limitations on post-conviction relief. <u>Hannah v. Conley</u>, 49 F.3d 1193, 1194-95 (6th Cir. 1995) (construing Tenn. Code Ann. § 40-30-102 and finding that the language of the statute is "mandatory").

B.   <u>**Legal Standard for Merits Review**</u>

The standard for reviewing constitutional claims on their merits in a suit for habeas relief is set forth in 28 U.S.C. § 2254(d). The section provides:

11

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This Court must determine, therefore, whether the state court adjudications of those claims presented were either "contrary to" or an "unreasonable application of" "clearly established" federal law as determined by the United States Supreme Court.  This Court must also determine whether the state court decisions were based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding.

### 1.   § 2254(d)(1)

The Supreme Court has issued a series of decisions setting forth the standards for applying § 2254(d)(1).  In (Terry) Williams v. Taylor, 529 U.S. 362, 404 (2000), the Court emphasized that the "contrary to" and "unreasonable application of" clauses should be accorded independent meaning.  A state-court decision may be found to violate the "contrary to" clause under two circumstances:

> [1] A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . [and] [2] A state-court

12

decision will also be contrary to this Court's clearly
established precedent if the state court confronts a set
of facts that are materially indistinguishable from a
decision of this Court and nevertheless arrives at a
result different from our precedent. Accordingly, in
either of these two scenarios, a federal court will be
unconstrained by § 2254(d)(1) because the state-court
decision falls within that provision's "contrary to"
clause.

Id. at 405-06 (citations omitted); see also Price v. Vincent, 538

U.S. 634, 640 (2003); Lockyer v. Andrade, 538 U.S. 63, 71-72

(2003); and Bell v. Cone, 535 U.S. 685, 694 (2002).[6] The Supreme

Court has emphasized the narrow scope of the "contrary to" clause,

explaining that "a run-of-the-mill state-court decision applying

the correct legal rule from our cases to the facts of a prisoner's

case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

clause." Williams, 529 U.S. at 406; see also id. at 407 ("If a

federal habeas court can, under the 'contrary to' clause, issue the

writ whenever it concludes that the state court's application of

clearly established federal law was incorrect, the 'unreasonable

application' test becomes a nullity.")(emphasis in original).

A federal court may grant the writ under the "unreasonable

application" clause "if the state court correctly identifies the

governing legal principle from [the Supreme Court's] decisions but

unreasonably applies it to the facts of the particular case."

_____

[6]    The Supreme Court has emphasized that this standard "does not require
citation of our cases—indeed, it does not even require awareness of our cases,
so long as neither the reasoning nor the result of the state-court decision
contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (emphasis
in original).

<u>Cone</u>, 535 U.S. at 694; <u>see also</u> <u>Andrade</u>, 538 U.S. at 75; <u>Williams</u>, 529 U.S. at 409.[7]  "[A]n unreasonable application of federal law is different from an incorrect application of federal law." <u>Williams</u>, 529 U.S. at 410.[8]   "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id.</u> at 409.

Finally, § 2254(d)(1) refers to "clearly established" federal law, "as determined by the Supreme Court of the United States." This provision "expressly limits the source of law to cases decided by the United States Supreme Court." <u>Harris v. Stovall</u>, 212 F.3d

---

[7]   Although the Supreme Court in <u>Williams</u> recognized, <u>in dicta</u>, the possibility that a state-court decision could be found to violate the "unreasonable application" clause when "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," 529 U.S. at 407, the Court expressed a concern that "the classification does have some problems of precision," <u>id.</u> at 408.  The <u>Williams</u> Court concluded that it was not necessary "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)," <u>id.</u> at 408-09, and, to date, the Supreme Court has not had occasion to revisit the issue.  <u>See</u> <u>Williams v. Coyle</u>, 260 F.3d 684, 699-700 (6th Cir. 2001).

[8]   <u>See also</u> <u>Andrade</u>, 538 U.S. at 75 (lower court erred by equating "objectively unreasonable" with "clear error"; "These two standards, however, are not the same.  The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam) (holding that the lower court "did not observe this distinction [between an incorrect and an unreasonable application of federal law], but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d).");  <u>Cone</u>, 535 U.S. at 698-99 ("For [a habeas petitioner] to succeed . . . , he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly.");  <u>Williams</u>, 529 U.S. at 411 ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.").

940, 944 (6th Cir. 2000).  As the Sixth Circuit explained:

> This provision marks a significant change from the
> previous language by referring only to law determined by
> the Supreme Court.  A district court or court of appeals
> no longer can look to lower federal court decisions in
> deciding whether the state decision is contrary to, or an
> unreasonable application of, clearly established federal
> law.

Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1999) (citing 17A

C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure §

4261.1 (2d ed. Supp. 1998)); see also Harris, 212 F.3d at 944 ("It

was error for the district court to rely on authority other than

that of the Supreme Court of the United States in its analysis

under § 2254(d)."). In determining whether a rule is "clearly

established," a habeas court is entitled to rely on "the holdings,

as opposed to the dicta, of [the Supreme] Court's decisions as of

the time of the relevant state-court decision." Williams, 529 U.S.

at 412.

### 2.   § 2254(d)(2)

There is scant case law about the standards for applying §

2254(d)(2), which permits federal courts to grant writs of habeas

corpus where the state court's adjudication of a petitioner's claim

"resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in

the State court proceeding." 28 U.S.C. § 2254(d)(2).  The few

decisions interpreting this provision have attempted to incorporate

the standards applicable to the "unreasonable application" prong of

15

§ 2254(d)(1).  Thus, the Sixth Circuit stated, in an unpublished decision, that

> a federal habeas court may not grant habeas relief under § 2254(d)(2) simply because the court disagrees with a state trial court's factual determination. Such relief may only be granted if the state court's factual determination was "objectively unreasonable" in light of the evidence presented in the state court proceedings. Moreover . . . , the state court's factual determinations are entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence.

Young v. Hofbauer, 52 Fed. Appx. 234, 236 (6th Cir. Dec. 2, 2002) (citing 28 U.S.C. § 2254(e)(1)); see also Sumner v. Mata, 449 U.S. 539, 546-47 (1981) (applying presumption of correctness to factual determinations of state appellate courts); Stanley v. Lazaroff, 82 Fed. Appx. 407, 416 (6th Cir. Oct. 3, 2003); Jackson v. Holland, 80 Fed. Appx. 392, 400 (6th Cir. Aug. 21, 2003) rev'd. __ U.S. __, 124 S.Ct. 2736 (2004)("Though the Supreme Court has not yet interpreted the 'unreasonable determination' clause of § 2254(d)(2), based upon the reasoning in Williams, it appears that a court may grant the writ if the state court's decision is based on an objectively unreasonable determination of the facts in light of the evidence presented during the state court proceeding.") (citing Torres v. Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000)).

**IV.  ANALYSIS**

**A.    Procedural Default Of Petitioner's Claims**

Respondent asserts that many of Petitioner's claims are

16

procedurally defaulted.[9]   In response, Petitioner has offered various arguments to explain why these claims are not procedurally defaulted.  Two of Owens' arguments in favor of excusing and/or not finding procedural default are general in nature and are used by her in response to many of Respondent's claims of procedural default.  These arguments are that 1) the Tennessee Supreme Court stated that it considered "the entire record . . . [and determined] that no reversible error was committed in either the guilt or sentencing phase of the trial", and 2) the Tennessee Supreme Court reviewed the entire record for fundamental error pursuant to Tenn. R. App. P. 52.  See Petitioner's Response to Respondent's Motion for Summary Judgment at 85-89.  Because Petitioner used these arguments to overcome Respondent's assertion of procedural default of many of Petitioner's habeas claims, the Court will address these contentions generally.

Petitioner insists that her claims were exhausted because the Tennessee Supreme Court "implicitly reviewed" issues in addition to those raised by Porterfield and Owens on direct appeal based on the court's statement that "[a]fter consideration of the several issues

---

[9]    Among the claims that Respondent asserts are procedurally defaulted are: Claim 1 – ¶ 35 (a)-(b), ¶ 36, ¶ 37 (a), ¶ 38, ¶ 39 (a)-(w), (y), (z), (aa), (ff)-(gg), (ii), (kk), (ll)-(oo), (ss)-(ww), ¶¶ 43-48; Claim 3 – ¶¶71-74, 76; Claim 4 – ¶¶ 77-83; Claim 5 – ¶¶ 84-89; Claim 6 – ¶¶ 90-95; Claim 7 – ¶¶ 96-106; Claim 8 – ¶¶ 107-09; Claim 9 – ¶¶ 110-11; Claim 10 – ¶ 112; Claim 11 – ¶ 113; Claim 12 – ¶¶ 114-24; Claim 13 – ¶¶ 125-27; Claim 14 – ¶¶ 129-30; Claim 15 – ¶¶ 138-44, 146-47; Claim 16 – ¶¶ 148-53; Claim 17 – ¶¶ 154-57; Claim 18 – ¶¶ 162-65; Claim 19 – ¶¶ 166, 169; Claim 20 – ¶¶ 172-76; Claim 21 – ¶¶ 177-79; Claim 22 – ¶¶ 180-81; Claim 23 – ¶¶ 183-84; Claim 24 – ¶¶ 185-201; Claim 25 – ¶¶ 202-204; and Claim 26 – ¶ 205.

17

and of the entire record, we are of the opinion that no reversible error was committed in either the guilt or sentencing phase of the trial . . . ."  Porterfield, 746 S.W.2d at 444.  Furthermore, Petitioner maintains that this Court may review claims, which were not specifically raised in the state courts, because the Tennessee Supreme Court "implicitly" considered the merits of these claims in the course of performing its required fundamental error review pursuant to Tenn. R. App. P. 52.

In Coe v. Bell, 161 F.3d 320 (6th Cir. 1998), the Sixth Circuit expressed reservations with "implicit review" arguments such as those offered by Petitioner.  See Coe, 161 F.3d at 336.  The Coe court considered the "implicit review" argument in the context of a challenge to jury instructions on unanimity in sentencing in a death penalty case in a Tennessee court.  Id. at 336.  The appellate court stated that the argument that "the [Tennessee] supreme court has to review significant errors, whether or not they were raised by the defendant," is "too broad, as it would eliminate the entire doctrine of procedural bar in Tennessee in capital cases."  Id.  Coe recognized, however, that Tennessee courts had been somewhat receptive to the implicit review theory.  See Cone, 359 F.3d 785.  Based on State v. Martin, 702 S.W.2d 560 (Tenn. 1985), overruled on other grounds by State v. Brown, 836 S.W.2d 530 (Tenn. 1992), in which the Tennessee Supreme Court stated that it was "required by statute to review the sentence and

to consider significant errors whether or not called to the attention of the trial court[,]" the Coe court explained that a procedural default could not arise under Tennessee law when a capital defendant raised an issue on appeal which he had failed to preserve properly during trial. Coe, 161 F.3d at 336. Thus, Coe adopted the implicit review theory, but only to the extent that the issues were explicitly raised on appeal, even though not properly preserved in the trial court. See Cone, 359 F.3d at 791.

The Sixth Circuit in Cone considered whether the petitioner had procedurally defaulted his claim that the application of Tennessee's heinous, atrocious, and cruel ("HAC") aggravator in a capital case resulted in the arbitrary imposition of the death penalty in violation of the Eighth Amendment, by failing to raise the issue on direct appeal. Id. The court determined that the petitioner did not procedurally default the claim by failing to raise it on direct appeal because the Tennessee Supreme Court implicitly reviewed the HAC aggravator issue in the course of its mandatory review. Id. This determination by the Sixth Circuit was based on Tenn. Code Ann. § 39-2-205(c) which requires the Tennessee Supreme Court in death penalty cases to conduct a mandatory death penalty review to determine whether:

> (1) The sentence of death was imposed in any arbitrary fashion;
>
> (2) The evidence supports the jury's findings of a statutory aggravating circumstance or statutory aggravating circumstances;

(3) The evidence supports the jury's finding
of the absence of any mitigating circumstances
sufficiently substantial to outweigh the
aggravating circumstance or circumstances so
found; and

(4) The sentence of death is excessive or
disproportionate to the penalty imposed in
similar cases, considering both the nature of
the crime and the defendant.

Id. (quoting Tenn. Code Ann. § 39-2-205(c) (1982) (current version

at Tenn. Code. Ann. § 39-13-206(c)(1) (2003)).   The Cone Court

concluded that the law in Tennessee is such that "the supreme court

'implicitly' reviews death sentences for arbitrariness, even if the

issue is not explicitly raised on direct appeal. . . ."   In so

ruling, however, the court noted that

the implicit review doctrine . . . does not
foreclose the possibility that other death
penalty defendants may procedurally default on
other constitutional issues not raised on
direct appeal. The language of Tennessee's
mandatory review statute provides a basis to
distinguish between vagueness challenges and
other constitutional claims, since it requires
the Tennessee Supreme Court to look
specifically for sentences "imposed in any
arbitrary fashion."

Id.   Therefore, the court limited its holding concerning implicit

review by the Tennessee Supreme Court to claims that minimize the

risk of wholly arbitrary and capricious action.   Id. (stating

that "[b]ecause there are other constitutional violations that do

not pose this same risk, the implicit review principle we have

applied today would not necessarily save those claims from

procedural default.").

20

This Court concludes, based on <u>Coe</u> and <u>Cone</u>, that Petitioner's arguments that her claims are not procedurally barred based on 1) the Tennessee Supreme Court's statement that "[a]fter consideration of the several issues and of the entire record, we are of the opinion that no reversible error was committed in either the guilt or sentencing phase of the trial . . . , " and 2) the Tennessee Supreme Court's implicit consideration of the merits of these claims in the course of performing its required fundamental error review pursuant to Tenn. R. App. P. 52, are not meritorious except with respect to Claim 19, ¶¶ 166-69, and Claim 20, ¶ 177.  Claim 19, ¶¶ 166-69, and Claim 20, ¶ 177, challenge respectively whether the Murder For Remuneration ("MFR") aggravator and the HAC aggravator as applied to Petitioner were appropriate narrowing instructions, i.e., whether her sentence of death was arbitrary based on the application of the MFR and HAC aggravators.  The remainder of the claims that Petitioner asserts were not procedurally defaulted based on the Tennessee Supreme Court's implicit review are alleged constitutional violations that do not pose the risk of arbitrary and capricious action, and as such, are not saved from procedural default based on <u>Cone</u> and <u>Coe</u>.  These claims include Claims 3, 5-11, 13-18, and 21-23.  The Court finds therefore that Petitioner has not procedurally defaulted Claim 19, ¶¶ 166-69, and Claim 20, ¶ 177.  The Court will address Respondent's remaining assertions of procedural default in the

analysis of her individual claims.

## B.   Claim 1 - Ineffective Assistance Of Counsel.

Petitioner asserts that she received ineffective assistance of counsel during the sentencing stage of her trial.   She maintains that her trial counsel failed to 1) investigate mitigating evidence, 2) obtain expert services, and 3) overcome the State's hearsay objections at the sentencing hearing.   The Court will address individually each of Petitioner's claims.

### 1.   Testimony Offered At Post-Conviction Hearing

Attorneys James Marty and Brett Stein represented Ms. Owens at trial.[10]  Marty was appointed as counsel for Ms. Owens in May 1985, and the trial began in January 1986.   See Addendum 13 at 20. Marty's testimony at the post-conviction hearing indicated that he recalled very little of the work he did in the case.   Id. at 17-111. He testified that he began practicing law in 1971, and at the time of Petitioner's trial in 1986, his practice was ninety-percent criminal.   Id.   Marty had served previously as lead counsel in three or four capital trials.   Id.

Marty testified that he and Mr. Stein had interviewed numerous witnesses, however, he was unable to recall their names or the subject matter of their conversations.   Id. at 37.   He further stated that his records likely did not include all of the witnesses he interviewed.   Id.   Marty seemed to remember, however, that Ms.

---

[10]     Mr. Stein replaced Wayne Emmons after he withdrew in December 1985.

Owens instructed him that she did not want him to interview her children nor were they to be involved with the trial. Id. at 44-45. He stated that he did not always write everything down on appointed cases, just what he remembered at the time. He testified that the time sheets were always "way short of the time" he actually spent working on the cases. Counsel did not request any school, employment, or military records of the victim because he believed they were irrelevant to the case.

Marty stated that he interviewed Dr. Max West, a psychiatrist who examined Ms. Owens once in 1978 after she was charged with embezzlement. Id. at 55-58. Dr. West testified during the sentencing phase in mitigation of the offense. Id. at 97. Marty indicated that the defense attorneys petitioned the trial court for funds for private mental health evaluations, but the trial court denied the request. Id. at 59-67. The court, however, did authorize Midtown Mental Health Center ("MMHC"), a state funded facility, to evaluate Owens. Id. at 63-64. MMHC attempted to perform a mental evaluation of Owens on three separate occasions, however, she refused to speak with them about anything other than her family history until she spoke with counsel. Id. at 71-75. Marty further testified that he and Stein did not advise his client not to talk to MMHC "because [they] needed the mental evaluation . . . ." Id.

Marty stated that at trial the defense theory was that Owens

23

had withdrawn the solicitations to kill her husband and that Porterfield murdered the victim in a burglary attempt. Id. at 107. Counsel indicated that he believed Owens' testimony was critical to her defense, however, despite the attorneys' efforts on several occasions to persuade her to testify, the Petitioner refused. Id. at 102-04. He opined that her testimony was crucial to support her innocence and to establish her mental state for mitigation. Id. at 102-09. At the trial, Marty proposed that no sane white lady would venture into an unfamiliar, all black neighborhood and openly solicit men on the street to kill her husband. Id. at 108.

At the post-conviction hearing, Brett Stein testified that he had practiced law since 1963, primarily handling criminal cases. Id. at 126. He was appointed to Owens' case approximately thirty days before her trial commenced. Id. at 127. Stein indicated that Marty served as lead counsel and made the strategy decisions. Id. at 130. The case was his first bifurcated capital trial. Id. at 156. Like Marty, Stein also was unable to remember much of his participation in the case given the time lapse from the trial to the post-conviction hearing. Id. at 126-74. He testified that he did not obtain Owens' medical, educational, or employment history. Id. at 140.

Wayne Emmons testified that he represented Ms. Owens from May 1985 until he withdrew in December 1985 because of commitments in other cases. Id. at 184. He testified that before withdrawing

from the case he filed a motion seeking the private services of mental health experts. <u>Id.</u> at 192. He indicated that he likely did not specify the reasons for the motion or any specifics such as cost of the expert because the motion was not filed ex parte. <u>Id.</u> at 195-97.

At the post-conviction hearing, Petitioner elicited the testimony of Eric Gentry, a traumatologist. <u>See</u> Addendum 13 at 217-01, 350-37. She offered Gentry's testimony, which related primarily to the social history he compiled of Petitioner and his clinical determinations derived therefrom (referred to as a psychosocial assessment), to establish what additional mitigation evidence the defense counsel could have presented during the penalty phase of the trial.[11] Among the testimony solicited from

---

[11]     The criminal court of appeals noted that the post-conviction court made the following observations in its written finding of facts concerning Gentry, <u>see</u> <u>Owens</u>, 13 S.W.3d at 752:

> Although [Gentry] was unlicensed in any discipline, he held a Masters in Counseling, and at one time had been licensed in West Virginia in Social Work. He had many "certifications," many of which were irrelevant to the psychological assessment of the petitioner, such as Art Therapy, Biofeedback, Eye Movement Desensitization, etc., and many of which were the result of weekend training seminars. He was tendered to the Court as an expert in Traumatology, which he explained as a study of traumatic experiences, the effects of traumatic experiences, and what effects they have on a person who's experienced them both from a point of view of a clinical point of view and from a disaster point of view
> . . . .
>
> He had not published, but had an article accepted for publication on "compassion fatigue," a study of emergency workers and their problems. He also had another work accepted as a chapter in a book on how to work with trauma survivors, which had not yet been published. His practical experience consisted of working one year in an adolescent shelter, 1 [and] ½

Gentry was his findings concerning statements made to him or investigators by Petitioner and several of her family members, friends, and acquaintances. Gentry testified that Owens grew up in a poor, filthy household. Id. at 300. He stated that Owens spent a considerable amount of time during her childhood with her aunt and uncle, Annie and Vardeman Nichols, whose home she allegedly preferred to her own. Id. at 300-01. Gentry related that Owens told him that her father would sometimes binge drink and beat his wife and children and that her mother also beat her. Id. at 300-02, 307-10. Gentry also testified that Owens indicated that she was sexually abused by her uncle, Marshall Kirksey, as a child. Id. at 305.

With respect to her relationship with her husband, Owens told Gentry that she was frequently sodomized by her husband and was

---

years as a counselor for a community agency, one year as a sex abuse counselor, one year working with homeless children, one year as an addiction counselor at a "wilderness school," and four years working for a psychiatrist as a therapist, gradually concentrating on survivors of trauma. He had no training or experience in forensic psychology. At the time of his testimony, he was a student at Florida State University studying marriage and family therapy and psychotraumatology. He claimed no expertise in anything other than his special area, and testified that "I consider myself an expert in working with survivors of trauma. That's the only thing--claiming any expertise in here as I sit in this chair right now." He stated he had never before testified as an expert, and would never testify as one again, after this hearing, because it was too hard. . . . When the witness was tendered as an expert in the field of Traumatology, this Court had serious reservations about his expertise, and asked the witness what he had been doing immediately before beginning his present studies at Florida State. Mr. Gentry answered that he had spent those last seven months prior to his current studies hiking the Appalachian Trail.

forced to have sex the night before the birth of her second child,
resulting in a partial-abruptio placenta and emergency cesarian
section. Id. at 355-56. Owens also told Gentry that when she
became pregnant with their first child, Mr. Owens was angry with
her because she did not take her birth control pills and he did not
think they could afford to have a child. Id. at 368. Owens was
charged twice with embezzlement, once after the birth of her oldest
child and again after the birth of her second child. Id. at 369-
70. Gentry opined that Owens likely embezzled to alleviate the
financial strain on the marriage. Id. He also concluded that
Owens has "very poor problem-solving and conflict resolution
skills" and "often will acquiesce to the needs and demands of
others in order to avoid social conflict." Addendum 13, Exhibit R
at 21.

Dr. West also testified at the post-conviction hearing. He
indicated that he examined Owens for an hour in 1978 after she was
charged with embezzlement. See Addendum 13 at 327. He determined
that the Petitioner did not exhibit symptoms of a psychotic
process, and there was no history of psychotic disorders in her
family. Id. at 323. Dr. West opined that Owens suffered from a
personality disorder and some depression resulting from her
developmental experiences at home. Id. He also testified that
Owens told him that she probably needed help, she had a hard time
being truthful with her husband and other people, and she began

27

stealing as a child.  Id. at 326.  She indicated that she and her husband had problems with sex early in her marriage, but it got better after the birth of their first child.  Id.  After being contacted by Stein in correspondence dated December 26, 1985, Dr. West responded via a letter in which he stated that at the time he evaluated Owens "it [was] extremely difficult, if not impossible to make a prediction in regards to possible future changes in the psychopathology which Ms. Owens has demonstrated."  Addendum 13, Exhibit H at 12.  Dr. West based his opinion on his "perception of [Owens] experiencing minimal if any guilt and remorse about her behavior, as she described events in her life during that [1978] session."  Id.

Dr. West also testified at the post-conviction hearing that Eric Gentry's impressions as expressed in his psychosocial assessment were consistent with and were a logical extension of his own conclusions about Owens from their one hour interview in 1978.  See Addendum 13 at 318-48.  Dr. West stated that "many factors would suggest [that Owens] was ideally situated to be sexually abused," but he indicated that, during their interview, she stated that "everything was fine with her husband."  Id. at 332-33.  Moreover, Owens told Dr. West that the sexual adjustment in her marriage was satisfactory and that she had no problems with her pregnancies.  Id.

At the close of Petitioner's offer, the State called Carolyn

Hensley, Owens' sister.  Id. at 438-78.  She had testified for the
State at Owens' trial.  Id. at 439.  Hensley retained custody of
Owens' sons after her arrest.  Id.  At the hearing, she testified
that Owens had told her trial attorneys not to contact any of her
family for trial purposes.  Id. at 440.  Hensley also indicated
that had Owens called her to testify at the trial for mitigation
purposes, she would not have done so.  Id. at 442.  Hensley opined
that "I think I would have hurt her if they'd have asked me much
more . . . in my mind I felt like that [sic] it was a matter of
taking a life. And I pretty much felt that whatever the jury
decided and the judge that that was how it was going to be."  Id.
at 442, 446. According to Hensley, her parents were very distraught
over the murder and would not have testified on Owens' behalf
either.  Id. at 445.  Hensley stated that no one in her family
wanted to testify in favor of Owens, saying "no one wanted to
change the sentence if that's what you're asking me."  Id.

    Hensley related that Gentry interviewed her before the
post-conviction proceeding, and she had reviewed his report.  Id.
at 447.  She testified that she did not agree with some of the
facts found in Gentry's report.  Id. at 450-66.  For example, she
noted that Owens never had meningitis and was never sexually abused
by her uncle.  Id. at 458-59.  Hensley admitted, however, that her
father was physically abusive to his children.  Id. at 455.

    Hensley also indicated that she frequently had social contact

with the deceased and her sister.  <u>Id.</u> at 463.  She stated that she never witnessed Mr. Owens abuse Petitioner nor did she notice anything unusual about his behavior.  <u>Id.</u>  Hensley testified that she talked with her sister daily.  <u>Id.</u> at 464.  Despite the fact that Owens confided in Hensley about her personal matters, the Petitioner never mentioned anything to Hensley about physical or sexual abuse.  <u>Id.</u>  Hensley recalled that Owens "spent money like crazy," and that her parents mortgaged their home in order to reimburse some of the money Owens embezzled from her employers.  <u>Id.</u> at 466. Hensley testified that Owens was a chronic liar, and she lied about matters that were not "even really serious."  <u>Id.</u> at 468.

### 2.   Analysis Of Ineffective Assistance Of Counsel Claims

The Sixth Amendment to the United States Constitution provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.  In <u>Strickland v. Washington</u>, 466 U.S. 668, 684 (1984), the Court stated that "the Sixth Amendment right to counsel exists," and is necessary "to protect the fundamental right to a fair trial."  A fair trial "is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding."  <u>Strickland</u>, 466 U.S. at 685.  The adversarial system as embodied in the Sixth Amendment includes the right to

30

counsel because such skill is needed to provide a defendant the "'ample opportunity to meet the case of the prosecution.'" Id. (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 275 (1942)). Accordingly, "'the right to counsel is the right to the effective assistance of counsel.'" Id. (quoting McMann v. Richardson, 397 U.S. 759, 771, n.14 (1970)). In defining what constitutes the constitutional requirement of effective assistance, the Strickland court noted that

> [i]n giving meaning to the requirement, however, we must take its purpose to ensure a fair trial--as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

Id. at 686. Furthermore, this principle applies equally to capital sentencing proceedings. Id. at 686-87.

The Strickland court established a two-part test for evaluating ineffective assistance of counsel claims. First, the defendant must demonstrate that counsel's performance was deficient such that counsel's errors were so serious that he was not functioning as constitutionally guaranteed. Id. at 687. Second, the defendant must show that counsel's inadequate assistance prejudiced the defense. Id. To establish prejudice, the defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.

31

Whether attorney performance was sufficient to provide a defendant with a fair trial is based on whether the assistance was reasonably effective. Id. Therefore, to establish cause, the defendant must demonstrate that counsel's performance "fell below an objective standard of reasonableness." Id. at 688. Reasonableness is determined by considering all the circumstances. Id. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id.

"To show prejudice, a defendant must demonstrate to a reasonable probability that, but for counsel's errors, the result would have been different." Smith v. Mitchell, 348 F.3d 177, 199 (6th Cir. 2003) (citing Strickland, 466 U.S. at 694). With respect to a challenge to a sentence of death, the prejudice determination is "whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. Courts evaluating an ineffective assistance claim need not address both prongs if the defendant fails to establish one. Id. at 697.

**a.    Failure To Investigate Mitigating Evidence**

Petitioner contends that counsel provided ineffective assistance by failing to investigate potential mitigation evidence. As an initial matter, Respondent asserts that this Court may not consider many of Petitioner's factual allegations when deciding this claim because those contentions were not presented to the state courts.[12]

---

[12]    Respondent contends that Petitioner may not rely on the following factual allegations in support of her claim of ineffective assistance of counsel: 1) counsel failed to interview Owens' parents, Jewell Wilson Kirksey, Carolyn Hensley, Esther Kirksey, Marshall Kirksey, Mary Nichols, Thelma Nichols, Rev. Jimmy Greer, and her former teachers, including Ruth Levenson (Claim 1, ¶¶ 35(a)-(b)(i)-(viii)); 2) counsel failed to interview Gala Scott, Dianne Wood, Buddy Bradley, Carolyn Nobles, Dr. Joey Hensley, Ruth Levenson, Lucy Walker Shaw, Elizabeth Farnell (Claim 1, ¶ 37(a)(i)-(viii)); 3) counsel failed to interview George Sykes, Larry Gant, George James, Michael Powell, and John Jordon (Claim 1, ¶ 38 (a)-(e); 4) had counsel interviewed the aforementioned people, counsel would have discovered that a) Owens' father was Jewell Kirksey, b) her mother was Izora Kirksey, c) Owens has a brother and a sister, d) her brother was born with cerebral palsy and is mentally retarded, e) her father worked long hours, f) her mother ran a baby-sitting business out of the family home, resulting in a disheveled home, g) neither of Owens' parents took care of her and her brother and sister, h) because her parents neglected their children, Owens had to provide care to her brother, i) her father was a mean spirited alcoholic, j) her father beat her mother and the children, k) the beatings often left bruises and welts on Owens' body, l) Owens' mother beat her on occasion, m) her parents physically and verbally fought, n) Owens' mother, in an attempt to avoid being beaten, required Owens to wait up with her at night until her father returned home from drinking, o) Owens' father threatened her mother with a butcher knife, p) Owens and her siblings often cried when their parents fought, q) her mother took money from her father and told him that Owens had taken the money, r) Owens was sent to live with the Vardaman Nichols family when her sister was born, s) Owens would stay periods of time with the Nichols family over the years and would cry when it was time to go home, t) Owens' uncle sexually abused her throughout her childhood, and Owens' mother refused to believe it, u) Owens' father made her strip naked and lie across a bed while he lashed her with a belt, v) upon graduating from high school, Owens left home and moved into an apartment in order to get away from her father and mother, w) shortly after moving out, Owens met Mr. Owens, x) on their honeymoon, Mr. Owens caused Ms. Owens to bleed, accused her of being frigid, and left the motel room threatening to "find someone else," y) Mr. Owens often demanded that his wife perform fellatio, which caused her to occasionally vomit, z) Mr. Owens forced Owens to submit to anal intercourse, aa) after the cesarian birth of their youngest son Mr. Owens went on a date with a woman with whom he was having an affair, bb) Mr. Owens engaged in sexually inappropriate conduct in public, cc) during their marriage, Owens' body weight fluctuated, dd) Mr. Owens humiliated his wife by publicly making comments related to Ms. Owens' weight gain, ee) Mr. Owens physically assaulted the Petitioner,

As previously noted, when a petitioner raises different factual issues under the same legal theory, she is required to present each factual claim to the highest state court in order to exhaust her state remedies. O'Sullivan, 526 U.S. at 845; see also Pillette, 824 F.2d at 496. A petitioner has not exhausted her state remedies if she has merely presented a particular legal theory to the courts without presenting each factual claim. Pillette, 824 F.2d at 497-98. To determine whether Petitioner's allegations may be considered, the Court must determine therefore whether she presented them to the state courts.

In the state court proceedings, Owens raised the issue of ineffective assistance of counsel as evidenced by counsels' failure to investigate mitigating evidence. See Addendum 14 at 16-24; Addendum 18 at 9-17. At the post-conviction hearing related to her claim of ineffective assistance of counsel, Petitioner presented the testimony of Eric Gentry, a traumatologist. See Addendum 13 at 217-01, 350-37. Gentry's testimony was offered to show what additional mitigation evidence the defense counsel could have

---

threatened to kill her, and threatened to leave her and take their children, ff) Mr. Owens used cocaine and amphetamines, gg) Owens sought psychiatric help from Dr. Max West, but stopped when Mr. Owens refused to attend counseling sessions, hh) prior to Mr. Owens' death, Mr. And Ms. Owens slept in separate beds, ii) Owens intended to commit suicide after finding her husband in a parking lot with another woman, jj) on her way to commit suicide, she decided instead to hire someone to kill Mr. Owens; she stopped and asked some African-American men if they would be interested in doing so, kk) for a month and a half Owens gave these men money to obtain items to be used to kill Mr. Owens and to keep them quiet, ll) Owens did not want her husband to suffer, and mm) she did not know the manner in which her husband would be murdered (Claim 1, ¶¶ 39 (a)-(w), (y)-(z), (aa), (ff)-(gg), (ii), (kk)-(oo), (ss)-(ww)).

presented during the penalty phase of the trial. Among the
testimony solicited from Gentry was his findings concerning
statements made to him or investigators by Petitioner and several
of her family members, friends, and acquaintances. Gentry relied
primarily on his psychosocial assessment of Petitioner when
testifying at the post-conviction hearing. Many of the people that
Gentry referenced in his assessment were persons who Petitioner
alleges in this Court that trial counsel should have interviewed
for mitigating evidence. These persons include Izora Kirksey,
Wilson Kirksey, Carolyn Hensley, Steven Owens, Brian Owens, Thelma
Nichols, Reverend James Greer, and Esther Kirksey. Furthermore,
Gentry's psychosocial assessment and testimony at the hearing
concerned what trial counsel allegedly would have uncovered about
Owens' background had they interviewed these individuals. Many of
Gentry's findings concerning Owens' background are the same
allegations that she offers in this Court in support of her claim
of ineffective assistance of counsel based on failure to
investigate. These findings and testimony include the allegations
put forth in Claim 1, ¶ 35(a)-(b)(i)-(iii); (b)(vi)-(viii) and ¶
39(a)-(w), (y)-(z), (aa), (ff)-(gg), (ii), (kk)-(oo), (ss)-(ww).

The Court recognizes that merely raising or referencing an
issue in the trial court is insufficient to exhaust state remedies.
The Tennessee Court of Criminal Appeals, however, the final state
court to rule on the merits of Petitioner's post-conviction motion,

clearly considered Gentry's assessment and testimony when deciding
Petitioner's claim of ineffective assistance of counsel based on
counsel's failure to investigate.   See Owens, 13 S.W.3d at 750-55.
Moreover, Owens' briefs to the court of criminal appeals and the
Tennessee Supreme Court reference Gentry's assessment and trial
testimony along with the post-conviction judge's findings
concerning Gentry's assessment and testimony.   Accordingly, this
Court may consider the allegations found in Claim 1, ¶ 35(a)-
(b)((i)-(viii)) and ¶ 39 (a)-(w), (y)-(z), (aa), (ff)-(gg), (ii),
(kk)-(oo), (ss)-(ww), when evaluating Petitioner's claim of
ineffective assistance of counsel based on counsel's alleged
failure to investigate mitigating evidence.   These allegations will
be viewed by the Court, however, only to the extent and form in
which they were presented to the state courts.   The Court further
finds that Petitioner's assertions in Claim 1, ¶¶ 37(a)(i)-
(a)(viii) and 38 (a)-(e), that trial counsel failed to interview
specific persons with knowledge of Mr. Owens' extramarital
relationships and with knowledge of Petitioner's actions and
activities in late 1984 to February 1985, were not presented to the
state courts.   Accordingly, the Court concludes that these claims
were not exhausted in the state courts, and are therefore now
procedurally defaulted such that this Court may not consider them.
O'Sullivan, 526 U.S. at 845.

The mitigation evidence offered at the sentencing hearing

consisted of the testimony of Dr. West that Petitioner had been treated by a psychiatrist on one occasion in 1978 for severe behavioral problems and testimony from two jail employees that Petitioner was a good prisoner who caused no problems, volunteered to work, and attended Bible study classes.

In support of her failure to investigate claim, Owens relies in part on trial counsel's time sheets which were submitted to the trial court for compensation.  Petitioner maintains that counsel's entry of only two hours for investigation is insufficient.  At the post-conviction hearing, trial counsel had difficulty remembering their involvement in the case which occurred almost ten years prior to the hearing.  Moreover, Stein's case file was destroyed in an office fire.  Marty also testified that the time recorded on his time sheets was "way short" of the actual time he spent working on the case.  The Court must examine the entire record of the trial proceedings to determine whether the appellant received effective assistance of counsel. See e.g., <u>Hopkinson v. Shillinger</u>, 866 F.2d 1185, 1217 (10th Cir. 1989), <u>overruled on other grounds by Sawyer v. Smith</u>, 497 U.S. 227 (1990)(holding that defendant must show specific errors, not solely based upon amount of time afforded to attorney to prepare defense)(citing <u>United States v. Cronic</u>, 466 U.S. 648, 654 (1984) and <u>United States v. Pearson</u>, 798 F.2d 385, 388 (10th Cir. 1986)). The court of criminal appeals determined, and this Court agrees that the length of time counsel spent on the

case is not dispositive of this issue.  See Owens v. State, 13
S.W.3d at 755.

Petitioner further asserts that her ineffective assistance
claim is evidenced by counsel's failure to investigate her
background, including her personal, medical, and mental history.
The court of criminal appeals determined that Petitioner
specifically alleged that counsel failed to obtain (1) her school
records; (2) the birth records of her children; (3) the file of Dr.
Max West; and (4) her records from Midtown Mental Health.  See id.
She contends that these records would have provided the jury with
the "psychodynamics of [her] background and why certain building
blocks of her personality never developed."  Petitioner maintains
that these records would show that she suffered from a "dependent
personality disorder" and an abusive childhood and marriage.

Counsel has an obligation to investigate and present
mitigating evidence at the penalty phase of a capital trial.  See
Wiggins v. Smith, 539 U.S. 510 (2003) (holding that scope of
investigation into client's "misery as a youth" fell short of the
professional standards then prevailing because counsel knew of
"unfortunate childhood" and there was nothing to suggest that
further investigation would have been either counterproductive or
fruitless); Williams v. Taylor, 529 U.S. at 398-99 (holding that
failure to investigate petitioner's background, which was horrific,
resulted in ineffective assistance as defined by Strickland);

38

<u>Coleman v. Mitchell</u>, 268 F.3d 417, 449 (6th Cir. 2001) (determining that counsel provided ineffective assistance of counsel by failing to discover and present the jury with defendant's personal history including evidence that defendant's grandmother physically and mentally abused him, neglected him while running a brothel and gambling house in her home, and involved defendant in voodoo practice by making him kill animals); <u>Skaggs v. Parker</u>, 235 F.3d 261, 269 (6th Cir. 2000) (finding ineffective assistance of counsel based on counsel's failure "to present the jury with a realistic view of [defendant's] mental status" because of counsel's inadequate preparation for the penalty phase of the trial); <u>Austin v. Bell</u>, 126 F.3d 843, 848 (6th Cir. 1997) (concluding that counsel provided ineffective assistance by failing to investigate and present mitigating evidence at the penalty phase of the trial, despite the fact that counsel "did not think it would do any good" to do so); <u>Glenn v. Tate</u>, 71 F.3d 1204, 1207 (6th Cir. 1995)(finding ineffective assistance of counsel because "the jury was given virtually no information on [defendant's] history, character, background and organic brain-damage--at least no information of a sort calculated to raise reasonable doubt as to whether [defendant] ought to be put to death . . . . The information was not presented to the jury because counsel never took the time to develop it."). The Supreme Court has determined that "[p]revailing norms of practice as reflected in American Bar

39

Association standards and the like . . . are guides to determining what is reasonable." <u>Strickland</u>, 466 U.S. at 688-89.  The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." <u>Wiggins</u>, 539 U.S. at 524 (citations omitted) (emphasis in original).  "Among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." <u>Id.</u> (citation omitted).

The post-conviction court, and court of criminal appeals, determined that Petitioner's trial counsel did not provide ineffective assistance of counsel by failing to investigate Petitioner's background.  In so concluding, the post-conviction court considered the evidence offered at the hearing and found that

> In addition to Mr. Gentry's lack of training and experience, this Court finds many of his sources of information appear highly suspect or biased.  His primary source for petitioner's social history was petitioner herself, who admittedly has a serious problem with truthfulness.  Much of the history she reported was contradicted by her family members, and all of the "sexual trauma" she reported was totally unsupported by any other witnesses or medical records . . . .  All of the "trauma" experienced by petitioner, on which Mr. Gentry based his opinions, such as sexual brutality performed on the victim by her husband, was totally unverified.  As an example, petitioner claimed that her husband

once raped her with a wine bottle, breaking
the neck of the bottle off in her vagina.
According to petitioner, she did not seek
medical treatment, however. There is no proof
in the record that she ever related any of
this alleged sex abuse or violence to anyone
during her entire marriage, or for the first
five months of her attorneys' representation.
She apparently first related this information
to her attorneys the week of the hearing on
her pretrial motions.   When asked if her
children were ever exposed to any of this, Mr.
Gentry responded that petitioner told him
"that Gaile and Ron were very careful to not
let the kids see any of the fights between
them that they had" so they would send the
kids out to play first.  Her family members
and friends denied that anything seemed wrong.

. . .

Not only was most of the history petitioner
related    to    Mr.    Gentry    unverified    by
independent   sources,   but   much   of   it   was
contradicted by her family and other prior
statements of petitioner herself.  As examples
of this, petitioner related to Mr. Gentry that
her uncle sexually abused her, and that she
had talked to her mother about it. Her mother
denied it.   Petitioner apparently never told
anyone about this molestation until preparing
for the hearing on this petition.   She said
she wanted to have children and the victim did
not,  and  was  angry  with  her  for  getting
pregnant, so she committed the embezzlements
to  eliminate  the  financial  strain  of  her
pregnancies. This flies in the face of all the
evidence that pointed to his loving his two
sons, and her reporting to Dr. West that she
stole because she wanted extra things for
herself and her family.   She also stated to
Mr. Gentry that in December 1985 [sic], she
caught her husband and Gala Scott coming back
together to his office early one morning, and
when he got angry at her for spying he slammed
her into his car and called her a "bitch."
She stated she decided at that time, while
driving out of the parking lot, to commit

41

suicide, and headed to the Mississippi bridge, but instead, apparently on impulse, asked a group of men she saw if they would kill her husband. She claims to have done this for only three days, and then stopped and began trying to recover the photographs and diagrams she had given the men. This unsupported allegation flies in the face of trial testimony that she repeatedly solicited her husband's death over a period of weeks and months. She also explained to Mr. Gentry that she was physically abused, but explained that she had told the police and Dr. West that she had never been physically abused because she didn't think things like being beaten with a belt was physical abuse. However, in her confession to the police she stated she had her husband killed because "We've just had a bad marriage over the years, and I just felt like he had . . . mentally I just felt like he had been cruel to me. There was very little physical violence."

...

No other witnesses support any of her alleged medical problems, or their causes, which are also unsupported by any documentation. Petitioner has failed to show her attorneys ineffective in failing to investigate her medical history, as there is nothing her attorneys could have discovered other than the unsupported statements of petitioner, who has been described as a chronic liar by her psychiatrist, her "traumatologist," and her sister.

...

In summary, the best person to have testified to all this abuse during trial would have been petitioner, if this story of continued sexual abuse and physical abuse were true. If her trial attorneys had called Mr. Gentry as a witness, or someone else in 1986 with the same lack of qualifications, his testimony would have been given little or no weight by the jury. Since his testimony as to petitioner's

42

> social history of trauma was based almost
> exclusively on what petitioner had told him,
> he could have been cross-examined about his
> knowledge of all of petitioner's embezzlements
> and forgeries, and the lack of verification
> for the "trauma" petitioner related to him
> would have been obviously apparent. He would
> not have been able to explain the lack of any
> indication of trauma in her history, testing
> and evaluation by Dr. West, which was taken
> after the abuse is alleged to have started,
> but prior to her husband's murder.  The state
> could have called petitioner's family members
> in rebuttal to deny the social history related
> by petitioner.  Finally, testimony of
> petitioner's suffering from "dependent
> personality disorder" would have negated a
> mitigating reason for her to have caused her
> husband's death.

Owens, 13 S.W.3d at 752-53.

Thus, in sum, the post-conviction court determined that counsel's purported failure to investigate Petitioner's background did not result in deficient performance because, had counsel investigated Petitioner's background, counsel would not have discovered any medical evidence of sexual or physical abuse by Mr. Owens; no one would have verified Mrs. Owens' allegations of sexual, physical or mental abuse; many of Mrs. Owens' allegations concerning her childhood would have been contradicted by her family; and Mrs. Owens' family did not wish to testify at the sentencing phase, and if called, would have given damaging testimony.

This Court notes that, at the post-conviction hearing, Petitioner could have called those persons that she asserts in her

habeas petition would have supported her allegations concerning her childhood/adolescence and marital relationship. She did not, however, call these persons to testify. Thus, with respect to Petitioner's background, the only evidence presented to the post-conviction court was Dr. West's and Gentry's testimony, which was based on statements made by Petitioner, statements made by others to Gentry, and statements made to investigators.

Dr. West had evaluated Petitioner one time in 1978, and his testimony consisted primarily of his conclusion that Gentry's assessment of Petitioner was consistent with his limited evaluation of her. Although Gentry's testimony would have been admissible at the sentencing proceedings despite the fact that it was replete with hearsay and double hearsay, the post-conviction court was in a position to hear and evaluate Gentry's testimony and determine the credibility and effect that such evidence would have had if presented to the jury. The post-conviction court determined

> that even assuming the performance of her trial attorneys was deficient, that deficiency caused no prejudice to petitioner. First, the nature and extent of the mitigating evidence that has been suggested should have been offered has little credibility or relevance. Second, although similar mitigating evidence was not presented, if it had been presented it would have opened the door to damaging evidence to the contrary. Finally, there was such strong evidence of petitioner's planning and participation [on] the day of the murder, such persistent, focused and long term offer of "remuneration for murder," and efforts at continued concealment after the murder, that the evidence would not have affected the

44

> jury's determination, and would have allowed the prosecution to put on in rebuttal otherwise irrelevant evidence of continued lies, manipulation and theft by petitioner, eradicating any good will or sympathy the jury might have had for petitioner due to the testimony of Dr. West and the two jail employees.

Id. at 755.

The post-conviction court concluded that Petitioner failed to show any deficient performance by her attorneys in preparing for the sentencing phase and that even if counsel was deficient, Petitioner did not suffer any prejudice. Id. The court of criminal appeals determined that the evidence did not preponderate against the post-conviction court's findings, and as a result, determined that Petitioner's claim was without merit. Id.

In assessing prejudice, a federal court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534. This Court's review is circumscribed, however, by the post-conviction court's conclusion with respect to prejudice, given that the post-conviction court reached the prejudice prong of the Strickland analysis. See id. This Court may grant relief only if the state court's factual determination was "objectively unreasonable" in light of the evidence presented in the state court proceedings. Moreover, the state court's factual determinations are entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence.

The Court finds that the post-conviction court's determinations that the mitigation evidence offered at the post-conviction hearing was not credible and, had it been presented to the jury, it would have opened the door to damaging evidence to the contrary, such that Petitioner was not prejudiced, are not "objectively unreasonable" in light of the evidence presented at the hearing. Moreover, Petitioner has not established by clear and convincing evidence that the post-conviction court's factual determinations are incorrect. Accordingly, this Court concludes that the post-conviction court's ruling did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the post-conviction hearing and that the state court's determination was neither contrary to, nor an unreasonable application, of clearly established federal law.

Petitioner also maintains that trial counsel provided ineffective assistance by failing to investigate Mr. Owens' records and background and extramarital affairs because they supported her position that she was physically, sexually, and mentally abused by him. She contends that records, such as his military and employment records, demonstrate that Mr. Owens lied about such things as serving in the Vietnam War and his educational and employment history. Furthermore, she asserts that Mr. Owens had extramarital affairs and was engaged in one at the time she

solicited his murder. Petitioner maintains that had trial counsel uncovered and presented such evidence to the jury, her claims of abuse by Mr. Owens would have been bolstered because the jury would have been provided with a picture of Mr. Owens other than that of an honest, hard-working family man. Petitioner asserts that the jury would have been more receptive to her claims of abuse had this proof been presented.

The post-conviction court determined that the victim's character traits were irrelevant for mitigation in a capital sentencing hearing. Owens, 13 S.W.3d at 755; State v. Johnson, 698 S.W.2d 631, 634 (Tenn. 1985); see also State v. Teague, 680 S.W.2d 785, 788 (1984) (victim's traits are irrelevant to mitigation evidence). The post-conviction court also observed that Petitioner's "claims of abuse were just that, claims, without any other corroborating evidence to support them," and as such, trial counsel had no reason to try to bolster these abuse contentions. Id. The court of criminal appeals determined that the evidence did not preponderate against the trial court's findings. Id.

The Supreme Court has held that a capital defendant is constitutionally guaranteed to present "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604-05 (1978). Courts may, however, "exclude, as irrelevant,

47

evidence not bearing" on those factors. <u>Id.</u> at 605.  In Tennessee, "evidence is relevant to the punishment only if it is relevant to a statutory aggravating circumstance or to a mitigating factor raised by the defendant." <u>Porterfield</u>, 746 S.W.2d at 449(citing <u>Cozzolino v. State</u>, 584 S.W.2d 765, 768 (Tenn. 1979)).

The court of criminal appeals determined that the post-conviction court's conclusion that evidence concerning Mr. Owens' background was irrelevant to the mitigation of Petitioner's case because Petitioner failed to corroborate her claims of abuse suffered at the hands of Mr. Owens was appropriate. <u>Owens</u>, 13 S.W.3d at 755.  As such, the court of criminal appeals opined that trial counsel's performance in allegedly failing to investigate the deceased's background was not ineffective. <u>Id.</u>

Petitioner has failed to produce clear and convincing evidence that the state courts' determination that she failed to corroborate her claims of abuse is incorrect.  The Court does not find the state courts' conclusion that Petitioner failed to establish that she suffered prejudice from trial counsel's alleged failure to investigate Mr. Owens' background objectively unreasonable. Furthermore, the Court determines that the post-conviction court's conclusion that trial counsel's alleged failure to investigate and present as mitigation evidence Mr. Owens' medical, educational, and employment records and proof of extramarital affairs, did not result in ineffective assistance of counsel, was neither contrary

to, nor an unreasonable application, of clearly established federal law.  Accordingly, the Court grants Respondent's motion for summary judgment as to Petitioner's claim of ineffective assistance of counsel based on failure to investigate mitigating evidence, Claim 1, ¶¶ 33-39.

### b.  Failure To Obtain Expert Services

Petitioner asserts that trial counsel provided ineffective assistance of counsel by failing to comply with procedural requirements when requesting funds prior to trial to employ a mental health expert.  She maintains that trial counsel failed to identify 1) the name of the proposed expert, 2) the type of expert, 3) how and when the expert services would be performed, 4) the cost of the services, and 5) a statement of need for the services. Owens further asserts that trial counsel should have made the request in an *ex parte* motion.  If trial counsel had complied with the procedural requirements and obtained the expert's services, that witness would have determined among other things that Owens had a troubled childhood, suffered from characterlogical problems, and at the time of the offense was suffering from a "moderately severe affective mental disorder."

The Tennessee Court of Criminal Appeals considered whether trial counsel rendered ineffective assistance in failing to file an *ex parte* motion for funds for a mental health expert.  In so doing, the court noted that prior to trial, counsel filed a motion

requesting funds for an independent mental health evaluation of Ms. Owens. Owens, 13 S.W.3d at 755. The court further observed that the trial court denied the motion, but ordered an examination be performed by Midtown Mental Health Center to determine her competency and sanity. Id. The appellate court then determined that Owens failed to establish that she was prejudiced by counsel's failure to request in an *ex parte* motion the services of an independent expert. Id. at 756. In order to receive funding for an independent expert, the appellate court stated that "[t]he defendant must show that a substantial need exists requiring the assistance of state paid supporting services and that this defense cannot be fully developed without such professional assistance." Id. (quoting State v. Evans, 838 S.W.2d 185, 192 (Tenn. 1992)). Notwithstanding the testimony of Eric Gentry, the court concluded that the proof did not establish that a "substantial need" existed for such services. Id.

In Ake v. Oklahoma, 470 U.S. 68 (1985), the Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue, if the defendant cannot otherwise afford one." Ake, 470 U.S. at 74. The Ake court further held that the State must provide similar expert assistance "in the context of a capital sentencing proceeding, when

50

the state presents psychiatric evidence of the defendant's future dangerousness." Id. at 83.  The Ake majority emphasized, however, that its ruling was limited to cases in which the defendant's mental condition was "seriously in question" upon a "threshold showing" by the defendant. Id. at 82.  Furthermore, the court determined that the state was obligated to provide only one competent psychiatrist and that it could choose that psychiatrist. Thus, the defendant's right does not include the selection of a psychiatrist of his choice.  Id. at 83 (noting that "[t]his is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own.").

The Sixth Circuit has interpreted Ake as requiring psychiatric assistance during the sentencing phase if 1) the defendant's sanity was a significant factor at trial, or 2) the state presents psychiatric evidence of future dangerousness at the sentencing phase.  Smith, 348 F.3d at 207; Mason v. Mitchell, 320 F.3d 604, 615-16 (6th Cir. 2003); Thompson v. Bell, 315 F.3d 566, 588-89 (6th Cir. 2003); Skaggs, 235 F.3d at 272; United States v. Osoba, 213 F.3d 913, 917 (6th Cir. 2000); Kordenbrock v. Scroggy, 919 F.2d 1091, 1120 (6th Cir. 1990) (en banc opinion of Kennedy, J., with five Judges concurring and one Judge concurring in the result).  Therefore, under current federal case law, a defendant who simply contests the mental element of the crime or the appropriateness of

the death penalty due to diminished capacity is not entitled to the assistance of an expert.

Tennessee has determined that expert services must be provided upon a showing of substantial need. Thus, instead of the two limited circumstances in which expert services are required pursuant to Ake, a defendant in Tennessee may receive expert services upon a showing of substantial need.

In the instant case, Petitioner did not assert an insanity defense nor did the prosecution attempt to establish at the sentencing hearing that she posed a future danger or threat. Instead, Petitioner sought the assistance of a mental health expert in order to present mitigation evidence that her mental health lessened her culpability in her husband's murder. The State therefore was not required under federal law to provide Petitioner with an independent mental health expert. The state court's determination that Owens failed to establish that a substantial need existed which required expert services is not contrary to federal law. As such, Owens has not established under Strickland that she was prejudiced by her trial counsel's failure to seek an independent mental health evaluation. The Court finds that the state court's ruling was neither contrary to nor an unreasonable application of federal law; nor was it an unreasonable determination of the facts in light of the evidence presented. Accordingly, the Court grants Respondent's motion for summary

judgment as to Claim 1, ¶¶ 40-42.

### c.   Failure To Overcome State's Hearsay Objections At The Sentencing Hearing

Petitioner's final claim of ineffective assistance of counsel is based on counsel's failure to overcome the State's hearsay objection made to Dr. West's testimony during the sentencing phase. At that hearing, trial counsel attempted to question Dr. West about Owens' social history. The State objected on the basis of hearsay. The trial court sustained the objection, despite the fact that Tennessee Code Annotated § 39-2-203(c)(repealed) permitted the introduction of hearsay testimony during the sentencing phase in a capital case.

The Tennessee Court of Criminal Appeals affirmed the post-conviction court's finding that Owens had not established ineffective assistance of counsel. _Id._ The court based its determination on the lower court's finding that Petitioner failed to establish prejudice as a result of trial counsel's actions. _Id._ The court concluded that Owens failed to establish prejudice because if Dr. West had been allowed to present hearsay testimony about Owens' social history, "he would have revealed, 'damaging admissions by petitioner that she had no problems with her marriage, and that she had a long term problem with lying and stealing, [which] would not have helped her gain sympathy with the jury.'" _Id._

Thus, the state court made a factual determination that Dr.

West's testimony would not have furthered Owens' case.  With respect to that determination

> a federal habeas court may not grant habeas relief under § 2254(d)(2) simply because the court disagrees with a state trial court's factual determination. Such relief may only be granted if the state court's factual determination was "objectively unreasonable" in light of the evidence presented in the state court proceedings. Moreover . . . , the state court's factual determinations are entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence.

Young, 52 Fed. Appx. at 236 (citing 28 U.S.C. § 2254(e)(1)).  This Court finds that although the state court's determination that Petitioner did not suffer prejudice from trial counsel's failure to overcome the hearsay objection may be unreasonable, it cannot be said that it is objectively unreasonable.  Accordingly, the Court grants Respondent's motion for summary judgment as to Claim 1 in its entirety.

### C.   Claim 2 – The State Violated The Sixth, Eighth, And Fourteenth Amendments By Withholding Exculpatory Evidence.

Petitioner asserts that the prosecution failed to provide her with any information that Mr. Owens "had numerous girlfriends, extramarital sexual affairs possibl[y] involving unusual sexual proclivities and/or perversions . . . ."  Addendum 1 at 149.  Owens claims that she requested this information because "these proclivities, perversions, and affairs were flaunted and visited upon [Petitioner] with such regularity and in such ways as to contribute to her state of mind and mental conditions . . . ."  Id.

54

During the investigation of Mr. Owens' murder, investigators discovered notes and letters from Gala Scott to Mr. Owens in his office.  The police report indicates that these letters evidence that Scott and the decedent had an affair.  The prosecution did not provide Petitioner with the letters or notes nor did they inform her of their existence.  Owens maintains that the prosecution's failure to disclose this evidence resulted in a violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

The court of criminal appeals determined that Petitioner's <u>Brady</u> claim was not meritorious because she was aware of her husband's extramarital affairs and the love letters and notes were not exculpatory.  <u>Owens</u>, 13 S.W.3d at 758.  The court of criminal appeals stated that

> [t]he proof establishes that [Petitioner] discovered the victim's affair with Gala Scott several months prior to the murder.  This discovery led [Petitioner] to consider suicide and subsequently solicit her husband's murder.  Moreover, [Petitioner's] attorneys were aware of extramarital affairs of the victim through their conversations with the appellant as evidenced by their request for information in their exculpatory motion.  The duty upon the State under *Brady* does not extend to information already in the possession of the defense or that they are able to obtain or to information not in possession or control of the prosecution.  <u>Banks v. State</u>, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977).
>
> More importantly, however, is the requirement that the information suppressed must have been exculpatory, i.e., favorable to the appellant.  We conclude that this evidence was not favorable and, accordingly, no *Brady* violation

55

> is found.   In this regard, we would not
> disagree with trial counsel's testimony that
> introduction of this evidence may have
> provided the appellant with a motive to kill
> her husband.   This issue is without merit.

Id. at 758-59.

In Brady v. Maryland, 373 U.S. 83 (1963), the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. The prosecution is required to disclose such evidence even if the accused has failed to request the evidence. United States v. Agurs, 427 U.S. 97, 107 (1976). The duty to disclose evidence includes impeachment evidence as well as exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676 (1985). The duty to disclose also encompasses evidence "known only to police investigators and not to the prosecutor." Strickler v. Greene, 527 U.S. 263, 280-81 (1999) (quoting Kyles v. Whitley, 514 U.S. 419, 438 (1995)). "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." Bagley, 473 U.S. at 678. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id.; see also Kyles, 514 U.S. at 433-34. "There are

three components of a true <u>Brady</u> violation: [1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." <u>Strickler</u>, 527 U.S. at 281-282.

With respect to the first component, the court of criminal appeals determined that the love letters were not exculpatory because they were not favorable to Owens. In so concluding, the court determined that the letters may have provided her with a motive to kill Mr. Owens. As Petitioner points out, however, this conclusion assumes that the evidence of the love letters would have been presented during the guilt phase. If such were the case, then certainly the evidence would not have been favorable. Petitioner asserts, however, that had she known of the letters, she could have used them to corroborate her allegation of mental abuse as mitigation evidence. The Court finds that it is unnecessary to determine whether the love letters and police report were exculpatory evidence because Petitioner has failed to establish the third element of a <u>Brady</u> claim, i.e., prejudice resulting from the suppression of the evidence.

<u>Brady</u> requires the disclosure of evidence that is material either to guilt or to punishment. The record indicates that Petitioner knew of Mr. Owens' affair with Scott months before his

57

murder.  In fact, Owens asserted that she solicited her husband's murder after finding him in a parking lot with Scott.  Moreover, as established by defense counsel's request for evidence of Mr. Owens' extramarital affairs, Petitioner had informed her attorney of Mr. Owens' liaisons.  Despite knowing this, the defense presented no mitigation evidence at the sentencing phase of the decedent's illicit conduct.

Petitioner maintains that she did not present such evidence because she had nothing to corroborate her allegations.  The Court finds this argument unavailing because she could have corroborated her allegations with Scott's testimony.  Had Petitioner wished to introduce evidence of the decedent's extramarital affairs, she could have subpoenaed Scott to testify.  Petitioner has not shown that there was a reasonable probability that her conviction or sentence would have been different had these materials been disclosed.  She therefore cannot show materiality or prejudice under Brady.  The Court finds therefore that the state court's conclusion that Petitioner's Brady claim is without merit is neither contrary to, nor an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; nor is it an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  Accordingly, the Court grants Respondent's motion for summary judgment as to Claim 2, ¶¶ 56-66.

D.   **Claim 3 - Petitioner's Fifth, Sixth, Eighth, And Fourteenth Amendment Rights Were Violated By 1) The Trial Court's Denial Of Petitioner's Request For Funds To Hire An Independent Mental Health Expert; And 2)The Denial Of Access To Counsel During Petitioner's Court-Ordered Mental Health Examination.**

Petitioner asserts that her constitutional rights were violated by the trial court's denial of her request for funds to employ an independent mental health expert. Before trial, Petitioner sought funds to hire a mental health expert to investigate her 1) competence to stand trial, 2) legal sanity at the time of the crime and mental state relating to her degree of culpability, and 3) matters related to mitigation in the event of conviction. At the hearing on Petitioner's request for funds, trial counsel informed the court of his belief that his client could assert a meritorious battered wife syndrome defense that would be relevant at both the guilt and sentencing stages. Addendum 2 at 148-65. In support of Ms. Owens' request for funds, trial counsel told the court about various allegations of sexual abuse that the Petitioner suffered at the hands of her husband. Id.

The trial court ordered Midtown Mental Health Center ("MMHC") to perform a competency and sanity exam. Addendum 1 at 67. The trial court further indicated that if either of these inquiries established that further testing was needed, it would reconsider

59

Petitioner's request for funds. Addendum 2 at 148-65. When MMHC attempted to evaluate Petitioner to determine her sanity at the time of the offense, she refused to answer their questions in the absence of her attorney. See Addendum 1 at 77. MMHC therefore was unable to perform an evaluation of Petitioner's sanity at the time of the crime. Id. The trial court thereafter denied Owens' request for funds to hire an independent mental health expert.

On direct appeal, the Tennessee Supreme Court denied Petitioner relief on this issue without discussion. She now seeks habeas relief from the state court ruling, basing her challenge to the trial court's ruling on Ake, 470 U.S. 68.

In Ake, the Supreme Court held that "when a defendant has made a preliminary showing that [her] sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue, if the defendant cannot otherwise afford one." Ake, 470 U.S. at 74 (holding that, upon a proper showing by the defendant, "the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense."). The Ake court further held that the State must provide similar expert assistance "in the context of a capital sentencing proceeding, when the state presents psychiatric evidence of the defendant's future dangerousness." Id. at 83. The Ake

60

majority emphasized, however, that its ruling was limited to cases in which the defendant's mental condition was "seriously in question" upon a "threshold showing" by the defendant. Id. at 82. Furthermore, the Court determined that the state was obligated to provide only one competent psychiatrist based on its selection. Thus, the defendant's right does not include the right to a psychiatrist of her choice. Id. at 83 (noting that "[t]his is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of [her] personal liking or to receive funds to hire [her] own.").

The Sixth Circuit has followed Ake by requiring psychiatric assistance during the sentencing phase only if 1) the defendant's sanity was a significant factor at trial, or 2) the state presents psychiatric evidence of future dangerousness at the sentencing phase. Smith, 348 F.3d at 207; Mason, 320 F.3d at 615-16; Thompson, 315 F.3d at 588-89; Skaggs, 235 F.3d at 272; Osoba, 213 F.3d at 917; Kordenbrock, 919 F.2d at 1120 (en banc opinion of Kennedy, J., with five Judges concurring and one Judge concurring in the result). Therefore, a defendant who simply contests the mental element of the crime or the appropriateness of the death penalty due to diminished capacity is not entitled to the assistance of an expert.

In the instant case, Owens did not assert an insanity defense nor did the prosecution attempt to establish at the sentencing

61

hearing that she posed a future danger or threat.   Instead, Petitioner sought the assistance of a mental health expert in order to present mitigating evidence that her mental health lessened her culpability in her husband's murder.   The State therefore was not required to provide her with an independent mental health expert. As such, the Court finds that the state court's ruling was neither contrary to nor an  unreasonable application of federal law; nor was it an unreasonable determination of the facts in light of the evidence presented.   Accordingly,  the  Court  denies  Petitioner relief on her <u>Ake</u> claim and grants summary judgment of Claim 3, ¶¶ 67-70, 75.

Petitioner  likewise  asserts  that  her  constitutional  rights were violated because she was denied access to her attorneys during a court-ordered mental health examination.  Claim 3, ¶¶ 71-74, 76. She refused to answer certain questions and as such the mental health expert was unable to evaluate her sanity at the time of the crime.   Respondent argues that Petitioner procedurally defaulted this claim by failing to raise it in the state courts.   Petitioner maintains, however, that these assertions merely supplement her claim that the trial court erred by failing to authorize funds for an independent mental evaluation.   Owens asserts therefore that pursuant to <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986), this claim is not  procedurally  defaulted  because  it  does  not  "fundamentally alter" the claim presented to the Tennessee courts.

In _Vasquez_, the state court considered the issue of whether blacks had been purposefully excluded from service on grand juries. _Vasquez_, 474 U.S. at 256-57. The state court concluded that no discrimination had occurred in the selection of grand juries. _Id._ During habeas review, the district court directed the parties to present supplemental evidence concerning such alleged discrimination. _Id._ The evidence consisted of affidavits and a computer analysis assessing the mathematical possibility that chance or accident could have accounted for the exclusion of blacks from grand juries. _Id._ The petitioner asserted that the inclusion and consideration of the new evidence by the district court circumvented the respondent's obligation to exhaust state remedies. _Id._ at 257. In concluding that the petitioner did exhaust the state court remedies, the Court determined that "the supplemental evidence presented by respondent did not fundamentally alter the legal claim already considered by the state courts"- i.e., whether respondent was denied equal protection of the law based on discrimination in grand jury selection. _Id._ at 260.

Unlike the evidence considered by the trial court in _Vasquez_, Petitioner's assertion that her constitutional rights were violated because she was denied access to her attorneys during a court-ordered mental health examination presents an entirely independent claim from that of whether the trial court erred in denying Petitioner's request for funds to employ an independent mental

63

health expert.   The evidence considered by the district court in Vasquez was material that the district court itself requested in order to more fully evaluate the claim which had already been considered by the state supreme court.   In the instant action, the state courts were never given an opportunity to review the merits of Petitioner's claim that her constitutional rights were violated because she did not have counsel present during her psychological evaluation.   Thus, the Court concludes that Petitioner's constitutional claim regarding the lack of access to her attorney during her mental evaluations fundamentally alters her legal claim that her Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated by the trial court's denial of Petitioner's request for funds to hire an independent mental health expert.

Petitioner failed to exhaust this claim in the state court proceedings and, thus, she is now barred by Tennessee's post-conviction statute of limitations and waiver provisions from asserting this claim.   Accordingly, Owens has procedurally defaulted the claim, and this Court may not consider its merits on habeas review.   The Court therefore grants Respondent's motion for summary judgment as to Claim 3, ¶¶ 67-76, in its entirety.

### E.   Claim 4 - Gender Discrimination In The Selection Of The Grand Jury Foreperson Resulted In The Violation Of Petitioner's Fourteenth Amendment Due Process Right.

Petitioner asserts that her Fourteenth Amendment right to due process was violated because gender discrimination systematically

64

occurred in the selection of grand jury foremen, including the selection of the foreman for the grand jury that indicted her. In support of this claim, Owens presented evidence at trial that no woman was appointed as a grand jury foreperson for a Shelby County, Tennessee, Grand Jury from 1862 through September 16, 1985. <u>See</u> Addendum 1 at 261; Exs. 4, 5. Respondent maintains, however, that Petitioner procedurally defaulted this claim because it was not included in her direct appeal to the Tennessee Court of Criminal Appeals or to the Tennessee Supreme Court.

A review of the record indicates that Petitioner in fact failed to present this claim at any time other than during the trial proceedings. The assertion of a claim during a trial does not satisfy the exhaustion requirement when it is not pursued on appeal. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838 (1999).

Owens next argues that her failure to exhaust this issue and the resulting procedural default should be excused based on counsel's ineffective assistance in failing to present this claim on appeal. In sum, she contends that she has established cause and prejudice sufficient to excuse the default based on ineffective assistance of counsel. A petitioner confronted with procedural default must show cause for the default and prejudice to obtain federal court review of his claim. <u>Teague</u>, 489 U.S. at 297-99; <u>Sykes</u>, 433 U.S. at 87-88. Cause for a procedural default depends on some "objective factor external to the defense" that interfered

with the petitioner's efforts to comply with the procedural rule. Coleman, 501 U.S. at 752-53; Murray, 477 U.S. at 488. An ineffective assistance of counsel claim may be used to establish cause for procedural default. Edwards, 529 U.S. at 453. The ineffective assistance of counsel claim relied upon to prove cause, however, must not have been procedurally defaulted. Id. If the ineffective assistance of counsel claim was procedurally defaulted, the default may be excused if the defendant can establish cause and prejudice to that claim. Id.

A review of the record indicates that Petitioner did not raise in the state courts the ineffective assistance of counsel to present a constitutional claim based on gender discrimination in the selection of the grand jury foreperson. As such, Owens failed to exhaust this claim in the state court proceedings and is now barred by Tennessee's post-conviction statute of limitations and waiver provisions from asserting this claim. Furthermore, she has not shown cause for the default or prejudice resulting therefrom, as is required to obtain federal court review of this issue. Petitioner therefore may not rely on her claim of ineffective assistance of counsel to establish cause for the default of her gender discrimination argument. The Court finds that Petitioner has not established cause to excuse her procedural default, and this Court may not consider the merits of the claim on habeas review. Accordingly, the Court grants Respondent's motion for

summary judgment as to Claim 4, ¶¶ 77-83.

F.  **Claim 5 – Petitioner's Conviction And Sentence Violate The Sixth, Eighth, And Fourteenth Amendments Because African-Americans Were Under-Represented On The Venire Due To Systematic Exclusion Of African-Americans From The Jury Selection Process And The State's Discriminatory Use Of Peremptory Challenges.**

Pursuant to <u>Duren v. Missouri</u>, 439 U.S. 357, 364 (1979), Petitioner asserts that a constitutional violation occurred because African-Americans were under-represented on panels from which prospective jurors were drawn. Likewise, pursuant to <u>Batson v. Kentucky</u>, 46 U.S. 79 (1986), she maintains that the State unconstitutionally used its peremptory challenges to exclude African-Americans from the jury. The Warden asserts that Petitioner has procedurally defaulted these claims because they were not included in her appeal to the Tennessee Court of Criminal Appeals or the Tennessee Supreme Court. Petitioner maintains that she did not default them because Porterfield raised the claims in his appellate brief, and she adopted them by reference in her appellate brief.

Rule 27 of the Tennessee Rules of Appellate Procedure provides that "[i]n cases involving multiple parties . . . any party may adopt by reference any part of the brief of another party." Tenn. R. App. P. 27(j). Therefore, any claims raised by Porterfield in his appellate brief and adopted by reference by

67

Petitioner were exhausted in the state courts, and as such are not procedurally defaulted.

The record indicates that Porterfield's brief included a claim based on the racial make-up of the venire.  See Addendum 8 at 2, 22 (asserting that "[t]he jury panels offered in the present case contained an under-representation of blacks due to systematic exclusion of blacks in the jury selection process. . . .").  Furthermore, in her appellate brief, Petitioner adopted by reference various other claims raised by Porterfield.  See Addendum 7 at 2 (adopting by reference issues I, II, III, IV, VI, XV, XVII, XIX from Porterfield's brief); Addendum 8 at 2-4 (listing and describing issues presented for review by Porterfield).  A review of Petitioner's brief, however, establishes that claim V, Porterfield's claim of racial discrimination, was not adopted by her.  Moreover, the issue of the discriminatory use of peremptory challenges by the State was not asserted by either Porterfield or Owens.  Thus, Petitioner failed to exhaust this claim in the state courts.  Claim 5 is therefore procedurally barred.

Moreover, even if Petitioner were not procedurally barred from asserting this claim, the district court previously rejected the arguments raised in this claim.  See Porterfield v. Bell, case no. 97-2362, Order On Respondent's Motion For Summary Judgment On The Habeas Corpus Petition And On Petitioner's Motion To Expand The Record, June 4, 1999, at pp. 31-34 ("Porterfield Order I");

68

Memorandum And Order Granting Respondent's Second Motion For Summary Judgment denying Petitioner's Motion For Summary Judgment And Denying Petition For Writ Of Habeas Corpus, December 18, 2000 ("_Porterfield_ Order II"). Specifically, the district court concluded that Porterfield "failed to develop the factual record" on his "_Duren_ claim" (see _Duren_, 439 U.S. at 364) of systematic exclusion of African-Americans from the jury pool and that "[b]ecause he lack[ed] facts to establish a _Duren_ violation, his claim must fail." _Porterfield_ Order I at pp. 32, 33.

Although neither Petitioner nor Porterfield raised the issue of the State's alleged discriminatory use of peremptory challenges, the district court determined that the Tennessee Supreme Court had addressed the issue and therefore it was deemed exhausted. _Porterfield_ Order II, p. 15. The district court found, however, that Porterfield failed to exercise diligence in creating a sufficient record which did not support a prima facie case pursuant to _Batson v. Kentucky_, 476 U.S. 79 (1986). _Porterfield_ Order II, pp. 15, and 20-30. Given that the record of Petitioner's _Batson_ claim is more insufficient than Porterfield's, Petitioner would not be entitled to relief even if this Court were to reach the merits of this issue. Moreover, Petitioner is not entitled as a matter of law to bring a _Batson_ claim because _Powers v. Ohio_, 499 U.S. 400 (1991), the United States Supreme Court decision that permitted white defendants to object to the exclusion of blacks from their

69

juries, was decided after Owens' conviction became final on direct appeal. Accordingly, the Court grants Respondent's motion for summary judgment as to Claim 5.

> **G.    Claim 6 - Petitioner's Conviction And Sentence Violate The Sixth, Eighth, And Fourteenth Amendments Because The Jury Was Tainted By Pretrial Publicity And The Trial Court Precluded Counsel From Effectively Exploring Jurors' Knowledge Of The Case.**

Petitioner asserts that the jury was tainted because she was prevented from effectively exploring the nature and extent of various jurors' knowledge of the case by the trial court. Respondent contends that Petitioner again procedurally defaulted this claim by failing to present it to the state courts. Owens did adopt this issue, Issue II of Porterfield, by reference in her brief. His brief, however, raised the claim of the tainted jury as a violation of the Sixth and Fourteenth Amendments. As Petitioner's assertion of a tainted jury is based upon an Eighth Amendment violation, it is procedurally defaulted as unexhausted in the state courts.

In <u>Porterfield</u> Order I, the district court determined that the Tennessee Supreme Court's factual conclusion that Porterfield and Owens did not suffer any prejudice from the denial of individual voir dire was not an unreasonable application of clearly established federal law as determined by the United States Supreme Court; nor were the Tennessee court's factual findings unreasonable. <u>Porterfield</u> Order I, pp. 29-30. Specifically, the

state supreme court ruled that the trial court's denial of individual voir dire was not error because prospective jurors were questioned by the trial court about their knowledge of the case. See Porterfield v. Bell, 746 S.W.2d 441, 447 (Tenn. 1988). Furthermore, most of the jurors who had been exposed to pretrial publicity indicated that they were only vaguely familiar with the case. Id. The trial court also advised the jurors that they could consider only the evidence presented during the trial and excused those jurors who indicated they could not set aside what they already knew about the case. Id. This Court finds, as in the Porterfield orders, that the state court's determination that neither Owens nor Porterfield suffered any prejudice from the denial of individual voir dire was not an unreasonable application of clearly established federal law as determined by the United States Supreme Court; nor were the Tennessee court's factual conclusions unreasonable. Accordingly, the Court grants Respondent's motion for summary judgment as to Claim 6.

**H.   Claim 7 - Petitioner's Conviction And Sentence Violate The Sixth, Eighth, And Fourteenth Amendments Because Prospective Jurors Were Exposed To A Reporter's Prejudicial Account Of The Proceedings.**

Owens alleges that the trial court's failure to declare a mistrial, after it was discovered that prospective jurors overheard a news reporter's account to his newspaper about the court

proceedings, violated her Sixth, Eighth, and Fourteenth Amendment rights. Respondent asserts that Petitioner is procedurally barred from asserting this claim because she did not exhaust her state remedies. Petitioner adopted this claim by reference from Porterfield's brief.

The Court finds Petitioner has defaulted the claim. The district court in Porterfield Order I determined that in the state court proceedings Porterfield did not frame this claim in terms of a constitutional violation. See Porterfield Order I, p. 30. Furthermore, Porterfield did not rely on state cases that used constitutional analysis in similar fact situations nor did he assert the claim in a manner so particular as to inform the state court that he was making a federal constitutional claim. Id. Accordingly, the state courts were not given a fair opportunity to consider the federal constitutional claim. Id. As such, Porterfield, and Owens by way of adoption of Porterfield's argument, defaulted the claim because it was not exhausted. It is now barred by Tennessee's post-conviction statute of limitations and waiver provisions.

Moreover, like the Porterfield district court, this Court notes that even if Owens could establish cause to excuse her default, Petitioner would not be entitled to habeas relief. See id. The trial judge questioned the prospective jurors concerning whether they overheard the news reporter's conversation and

72

admonished them that news reports were not evidence. When several of the prospective jurors indicated that they had overheard the telephone call, Owens and Porterfield moved for a mistrial or in the alternative for a new jury panel. See Porterfield v. Bell, 746 S.W.2d 441, 447 (Tenn. 1988). The trial court denied the motion, but permitted individual voir dire on the incident. Id. The trial judge determined that those who were questioned individually had not overheard anything prejudicial or even substantial. Id. The trial court's finding is entitled to a presumption of correctness, and Petitioner has failed to develop a factual basis for disputing this claim. See 28 U.S.C. § 2254(e). Accordingly, the Court grants Respondent's motion for summary judgment as to Claim 7.

I.   **Claim 8 - Petitioner's Conviction And Sentence Violate The Sixth, Eighth, And Fourteenth Amendments Because Prospective Jurors Were Exposed To Prejudicial Information During Group Voir Dire.**

Petitioner asserts that two comments made by prospective jurors during voir dire prejudiced the venire.[13] Respondent asserts that Petitioner failed to exhaust this claim in the state courts, despite her adoption of Porterfield's brief by reference. The Tennessee Supreme Court, when analyzing the merits of this issue, discussed it in the context of both Owens and Porterfield.

---

[13] One prospective juror, in response to defense counsel's question, stated that a person serving a life term would only "stay in there" a certain amount of time. When asked about his knowledge of the case, another potential juror stated that his wife read the papers and told him of the important items. He further said, "I just know what went down, and I know that there is a case." Both prospective jurors were peremptorily dismissed.

<u>Porterfield</u>, 746 S.W.2d at 448.  Despite Petitioner's adoption of the claim in the state court, it is defaulted.

In <u>Porterfield</u> Order I, the district court concluded that in the state court proceedings Porterfield did not frame this contention in terms of a constitutional violation despite having raised the issue of jury prejudice based on the comments of the prospective jurors.  See <u>Porterfield</u> Order I, p. 30.  Furthermore, Porterfield did not rely on state cases that used constitutional analysis in similar fact situations nor did he assert the claim in a manner so particular as to inform the state court that he was making a federal constitutional claim.  <u>Id.</u>  Accordingly, the state courts were not given a fair opportunity to consider the federal constitutional claim.  <u>Id.</u>  This Court agrees with the <u>Porterfield</u> court's conclusion.  As such, Porterfield, as well as Owens, have defaulted this issue because it was not exhausted.  Likewise, the claim is now barred by Tennessee's post-conviction statute of limitations and waiver provisions.

Moreover, the Court agrees with the <u>Porterfield</u> district court's finding that even if Porterfield, and therefore Owens, could establish cause to excuse their default, they are not entitled to relief.  See <u>Porterfield</u> Order I, p. 31.  Petitioner failed to show that the jury which was selected was prejudiced or biased by the statements of the two prospective jurors.  <u>See</u> <u>Porterfield</u>, 746 S.W.2d at 447-48.  Furthermore, the Tennessee

courts determined that these comments did not prejudice either Owens or Porterfield.  See Porterfield, 746 S.W.2d at 447-48 (stating that "[t]he comments did not in any way affect the presumption of innocence or in any way lessen the burden of the state to prove its case.").  Petitioner, like Porterfield, has established no reason for this Court to cast doubt on the Tennessee Supreme Court's conclusions.  Accordingly, the Court grants Respondent's motion for summary judgment as to Claim 8.

**J.  Claim 9 - The Trial Court Violated Petitioner's Sixth, Eighth, And Fourteenth Amendment Rights By Denying Her Request For Individual, Sequestered, Voir Dire.**

Petitioner contends that the venire was tainted by prejudicial pretrial publicity, and the trial judge erred by not allowing individual, rather than group, voir dire.  Respondent asserts that Petitioner failed to exhaust this claim in the state courts, despite her adoption of Porterfield's brief on this argument.  The Tennessee Supreme Court, when analyzing the merits of this claim, discussed it in the context of both Owens and Porterfield.  To the extent that it was raised in the state courts by Porterfield's brief, this Court finds that Owens exhausted the claim, and thus it is not procedurally barred.

Porterfield presented this argument as a violation of the Sixth and Fourteenth Amendments.  The state courts, therefore, did not have an opportunity to consider the individual voir dire claim in the Eighth Amendment context.  Accordingly, Petitioner

75

procedurally defaulted any claimed violation of the Eighth Amendment based on the trial court's denial of individual, sequestered voir dire.

The district court in <u>Porterfield v. Bell</u>, No. 97-2362 (W.D. Tenn. 1999), considered this same issue. The <u>Porterfield</u> district court concluded that the Tennessee Supreme Court's ruling that Owens and Porterfield did not suffer any prejudice from the trial court's denial of individual voir dire was not an unreasonable application of clearly established federal law as found by the United States Supreme Court; nor were the Tennessee Supreme Court's factual determinations unreasonable. <u>See Porterfield</u> Order I, pp. 29-30. This Court concurs with the <u>Porterfield</u> district court.

Potential jurors need not be completely ignorant of the facts and issues of a case. <u>See Murphy v. Florida</u>, 421 U.S. 794 (1975). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." <u>Id.</u> at 800. The Tennessee court determined that the trial court's denial of individual voir dire was not an error because the trial court questioned the prospective panel about their prior knowledge of the case. <u>See Porterfield</u>, 746 S.W.2d at 447. Most of the potential jurors who were exposed to pretrial publicity stated that they only vaguely recalled what they had heard or read. <u>Id.</u> Moreover, the trial court admonished the jurors that they were to consider only the evidence presented during trial and excused

76

those who could not lay aside what they already knew. Id. After a review of the record, this Court concludes that the Tennessee court's determinations were not an unreasonable application of clearly established federal law, nor were its factual findings unreasonable. See 28 U.S.C. § 2254(d). Accordingly, the Court grants Respondent's motion for summary judgment as to Claim 9.

### K.   Claim 10 - The Trial Court Violated The Sixth, Eighth, And Fourteenth Amendments By Striking For Cause Prospective Jurors.

Owens argues that the trial court's dismissal for cause of prospective jurors, who indicated that they had reservations about the death penalty, was a violation of the Sixth, Eighth, and Fourteenth Amendments. Specifically, Petitioner points to the trial court's dismissal of Charlayne Pickett and Dorothy Newberry. Respondent asserts that Petitioner has procedurally defaulted the claim because she merely relied on the brief filed by Porterfield. As previously noted, adoption of a co-party's brief by reference, however, is permitted under Tennessee law. Furthermore, the Tennessee Supreme Court, when analyzing the merits of the claim, discussed it in the context of both Owens and Porterfield. See Porterfield, 746 S.W.2d at 447 (stating that "[e]xception was taken by the defendants to the exclusion of a prospective juror, Charlayne Pickett, for cause."). Therefore, to the extent that the claim was raised in the state courts by Porterfield's brief, the Court finds that Petitioner exhausted the claim, and is not

procedurally barred from raising it.[14]

A prospective juror who is categorically unwilling to impose a sentence of death in a capital case may be excused for cause. See Lockhart v. McCree, 476 U.S. 162 (1986); see also Wainwright v. Witt, 469 U.S. 412, 424 (1985) (permitting dismissal of a prospective juror where the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."). A prospective juror who does not favor the death penalty but is willing to set aside his personal views in accordance with the law may serve on a capital jury. See Lockhart, 476 U.S. at 176. If a juror is unwilling or unable to properly and impartially apply the law to the facts of the case during both the guilt and sentencing phases of a capital trial, the prospective juror may be excluded. Id. at 175-77.

Pickett indicated that she would consider the defendants' guilt or innocence based on the facts, but she would automatically vote against the imposition of death in any case. See Addendum 4. Like the Porterfield district court, this Court concludes that based on the juror's statement, the decision of the trial court to strike Pickett for cause was not an unreasonable application of federal law. Accordingly, the Court grants Respondent's motion for

---

[14]    Petitioner exhausted her claim as to Charlayne Pickett. However, Petitioner's claims that other prospective jurors were improperly excluded based on their views of the death penalty are defaulted because they were not presented to the state courts and are now barred by the statute of limitations.

summary judgment as to Claim 10.

**L.    Claim 11 – The Trial Court Violated The Sixth, Eighth, And Fourteenth Amendments By Failing To Strike For Cause Prospective Jurors Including Rhea Benson And Richard Piersing.**

Petitioner contends that the trial court erred by failing to strike for cause prospective jurors who could not consider imposing a sentence of life imprisonment upon a finding of guilt.  A review of the record indicates that Petitioner did not raise the issue in the state courts.  Moreover, she does not allege that cause or prejudice exists to overcome the procedural default.  Accordingly, the Court grants Respondent's motion for summary judgment as to Claim 11.

**M.    Claim 12 – Petitioner's Death Sentence Violates The Sixth, Eighth, And Fourteenth Amendments Because One Of The Jurors Falsely Testified During Voir Dire That She Could Consider Imposing A Life Sentence.**

Petitioner asserts that Dora S. Jehl falsely testified during voir dire that she could consider a sentence of life imprisonment if Petitioner was convicted.  A review of the record indicates that Petitioner failed to exhaust this claim in the state court proceedings and, thus, is now barred by Tennessee's post-conviction statute of limitations and waiver provisions from asserting this claim.[15]  Accordingly, Petitioner has procedurally defaulted the

---

[15]    Petitioner admits in her Traverse that she failed to present evidence to support Claim 12 during her post-conviction proceeding.  See Owens v. Guida, No. 00-2765, Traverse at 5.

claim, and this Court may not consider its merits on habeas review. The Court therefore grants Respondent's motion for summary judgment as to Claim 12.

**N. Claim 13 - The Trial Court Violated The Sixth, Eighth, And Fourteenth Amendments By Allowing The Introduction Of Porterfield's February 22, 1985 Statement.**

Petitioner claims that the trial court allowed the introduction of Porterfield's statement that he killed Mr. Owens after being asked by Petitioner in violation of <u>Bruton v. United States</u>, 391 U.S. 123 (1968), and its progenies. A review of the record indicates, however, that Petitioner failed to raise a <u>Bruton</u> issue in the state court proceedings.

Owens relies on her direct appeal brief, Porterfield's direct appeal brief, pre- and post-trial motions, and <u>Porterfield</u>, 746 S.W.2d 441 (Tenn. 1988), to establish that she exhausted this claim in the state courts. The Court reviewed each of these in turn. Her direct appeal brief did not raise a <u>Bruton</u> issue. Petitioner did challenge the trial court's denial of her severance motion, however, the challenge did not raise the issue of the admission of Porterfield's statement nor did it mention <u>Bruton</u>. <u>See</u> Addendum 7 at 6-8. Furthermore, the Tennessee Supreme Court, after discussing Porterfield's <u>Bruton</u> claim, stated that Petitioner did not raise a <u>Bruton</u> issue. <u>See Porterfield</u>, 746 S.W.2d at 446 (stating that "[w]hile not raising a <u>Bruton</u> issue, Mrs. Owens insists she was prejudiced by having to try her case with that of Mr. Porterfield

80

as it prevented her from pleading guilty and taking a proffered life sentence.").

Petitioner's reliance on Porterfield's direct appeal brief likewise fails to establish that the claim was exhausted in the state courts.   Porterfield did raise a <u>Bruton</u> issue on direct appeal, but  it related solely to the introduction of Petitioner's statement, not Porterfield's statement.  <u>See</u> Addendum 8 at 24-27. Moreover, she did not adopt by reference this portion of Porterfield's direct appeal brief.

The Court finds that Petitioner failed to exhaust this claim in the state court proceedings and is now barred by Tennessee's post-conviction statute of limitations and waiver provisions from asserting this claim.   Therefore, Petitioner has procedurally defaulted the claim, and this Court may not consider it on habeas review.   Accordingly, the Court grants Respondent's motion for summary judgment as to Claim 13.

## O.   Claim 14 - The Guilt Stage Instructions Violated The Sixth, Eighth, And Fourteenth Amendments.

Owens maintains that various instructions given by the trial court during the guilt stage were error.  Specifically, Petitioner alleges that the trial court erred by 1) equating the concept of reasonable doubt with moral certainty; 2) instructing the jury that the law presumes that witnesses testify truthfully; and 3) instructing the jury that intent or design to kill may be conceived and deliberately formed in an instant, and a person may be guilty

of deliberate murder even though he was controlled by passion at the time of the homicide.  The Court will address each instruction in kind.

At the guilt phase, the trial court instructed the jury that

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of guilt.  Reasonable doubt does not mean a doubt that may arise from possibility.  Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

Addendum 5 at 27.  On appeal from the denial of post-conviction relief, the Tennessee Court of Criminal Appeals held that these instructions did not fall below the requirements of the Due Process Clause.  See Owens, 13 S.W.3d at 765.  In so holding, the court noted that such instructions have been upheld on numerous occasions.  Id.  Among the cases relied upon by the court was Austin, 126 F.3d at 846-47, in which the Sixth Circuit ruled that such an instruction did not lower the constitutional burden of proof.  The Austin Court determined that a reasonable doubt instruction like that found in this case was "more like the acceptable language in Victor [v. Nebraska, 511 U.S. 1 (1994)], than the unacceptable language in Cage [v. Louisiana, 498 U.S. 39 (1990)]."  Austin, 126 F.3d at 847.  The Austin Court noted that "[t]he language of an 'inability to let the mind rest easily' lends

content to the phrase 'moral certainty' similar to the 'abiding conviction' language in <u>Victor</u>, increasing, if anything, the prosecutor's burden of proof." <u>Id.</u> As such, the <u>Austin</u> Court held that the "moral certainty" reasonable doubt jury instruction did not violate the United States Constitution.

The "moral certainty" jury instruction at issue in this case is virtually identical to the one in <u>Austin</u>. This Court concludes, therefore, that the decision of the state court was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court; nor were the Tennessee court's factual determinations unreasonable. <u>See</u> 28 U.S.C. 2254(d). Accordingly, the Court grants Respondent's motion for summary judgment as to the "moral certainty" reasonable doubt jury instruction issue found in Claim 14.

Owens also asserts that the trial court erred by instructing the jury to presume that witnesses testify truthfully, that intent or design to kill may be formed in an instant, and that a person may deliberate even when controlled by passion. Petitioner failed to raise these issues in the state courts.

As such, the Court finds that Petitioner did not exhaust these claims in the state court proceedings. They are now barred by Tennessee's post-conviction statute of limitations and waiver provisions. Therefore, Petitioner has procedurally defaulted the claims, and this Court may not consider their merits on habeas

review.   Accordingly, the Court grants Respondent's motion for summary judgment as to Claim 14.

**P.   Claim 15 - The Trial Court Violated The Sixth, Eighth, And Fourteenth Amendments By Not Allowing Petitioner To Present Evidence At The Sentencing Hearing.**

Petitioner asserts that the trial court erred when it refused to allow her to present certain evidence in mitigation during the sentencing hearing.   The omitted evidence includes 1) that Petitioner wanted to plead guilty in exchange for a sentence of life but was not allowed to do so because the State's offer required Porterfield also to plead guilty, which he refused to do; 2) the testimony of Dr. Max West concerning Petitioner's family background; and 3) the testimony of Elizabeth Bratcher that Petitioner loved her children.   The Court will discuss each of these claims individually.

The State offered Petitioner a sentence of life in return for a plea of guilty provided that Porterfield also plead guilty. During the sentencing phase, Petitioner attempted to present to the jury her willingness to plead guilty as mitigation evidence.  See Addendum 4 at 1899.   The trial court denied the request, id. at 1900, which was affirmed by the Tennessee Supreme Court on direct appeal.   See Porterfield, 746 S.W.2d at 449.   The state supreme court determined that pursuant to Lockett, 438 U.S. 586, and Cozzolino, 584 S.W.2d 765, the trial court was not required to admit this evidence during the sentencing phase.   The state court

84

concluded that Petitioner's "interest in accepting a plea bargaining offer is not relevant to either the issue of punishment or to any mitigating factor raised by Petitioner . . . ." Porterfield, 746 S.W.2d at 449.

In Lockett, the United States Supreme Court held that a capital sentencer may not be precluded from considering any aspect of the defendant's character, record, or circumstances of the offense in mitigation. Lockett, 438 U.S. at 604. Courts may, however, "exclude, as irrelevant, evidence not bearing" on those factors. Id. In Tennessee, "evidence is relevant to the punishment only if it is relevant to a statutory aggravating circumstance or to a mitigating factor raised by the defendant." Porterfield, 746 S.W.2d at 449 (citing Cozzolino, 584 S.W.2d at 768 ). The Court finds that the state court's ruling that evidence concerning a plea bargain was irrelevant to any mitigating factor raised by Petitioner, and thus properly excluded, does not contravene Lockett. As such, the decision was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. See 28 U.S.C. § 2254(d). The Court therefore grants Respondent's motion for summary judgment as to Claim 15, ¶¶ 131-37, 145.

Owens' next claim of error concerning the sentencing phase relates to the testimony of Dr. West, a psychiatrist who evaluated Petitioner on one occasion. She asserts that the trial court erred

85

when it sustained the prosecution's hearsay objection to defense counsel's questioning of Dr. West concerning Petitioner's family background.   The record reveals, however, that she did not raise this issue on direct appeal or during post-conviction proceedings. Petitioner did raise the issue of Dr. West's testimony in relation to her claim of ineffective assistance of counsel.   This, however, did not provide the state courts an opportunity to examine Petitioner's claim of a constitutional violation based on the trial court's ruling on the hearsay objection to Dr. West's testimony.

Likewise, Owens did not pursue in the state courts a claim that the trial court erred by sustaining a hearsay objection to the testimony of Elizabeth Bratcher as to whether she had an impression about Petitioner's feelings for her children.   Additionally, Petitioner did not use the trial court's ruling to support her claim of ineffective assistance of counsel.   Therefore, Petitioner failed to give the state courts an opportunity to determine whether a constitutional violation resulted from the exclusion of Bratcher's testimony.

The Court finds that Petitioner failed to exhaust these claims in the state court proceedings and is now barred by Tennessee's post-conviction statute of limitations and waiver provisions from asserting them.   Therefore, she has procedurally defaulted the claims, and this Court may not consider them on habeas review. Accordingly, the Court grants Respondent's motion for summary

86

judgment as to Claim 15.

> **Q.  Claim 16 - The Prosecution Violated The Sixth, Eighth, And Fourteenth Amendments By Stating That It Did Not Intend To Introduce The Morgue Photographs And Later Introducing Them During The Sentencing Stage.**

During voir dire, the prosecution told the court and defense counsel that they did not intend to introduce morgue photographs of Mr. Owens.  During the sentencing phase, however, the prosecution introduced two such photographs over the objection of the defense counsel.  Petitioner asserts that the probative value of the photographs was outweighed by their prejudicial effect and that their introduction violated the prosecution's oral stipulation.

On direct appeal, Petitioner adopted this claim by reference from Porterfield's brief as permitted by Rule 27 of the Tennessee Rules of Appellate Procedure.  Likewise, when ruling on the claim, the Tennessee Supreme Court referenced the claim as that of Petitioner's and Porterfield's.  See Porterfield, 746 S.W.2d at 449.  Accordingly, Petitioner exhausted the claim in the state courts, and this Court may review it.

When considering the issue of whether the photographs were unduly prejudicial, the Tennessee Supreme Court stated that

> [t]he photographs in question were relevant to proving one of the statutory aggravated circumstances - - that is, whether the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind. While undoubtedly prejudicial to the defendants, in the sentencing stage of the proceedings and in view of the aggravating

87

> circumstance alleged, they were highly
> probative of the nature and extent of the
> injuries inflicted upon Mr. Owens.

Id. at 450. The prosecution is prohibited from presenting evidence intended to appeal purely to passion rather than reason. See Gardner v. Florida, 430 U.S. 349, 358 (1977). As the Tennessee Supreme Court determined, however, the photographs were highly probative to an aggravating circumstance. Thus, this Court concludes, as did the district court in Porterfield when considering this issue, that the state court's decision is not contrary to clearly established federal law, nor is it an unreasonable finding of fact. See Porterfield Order I at 52.

With respect to the prosecution's pretrial representation that they did not intend to introduce the photographs, the state court determined that the oral stipulation made by the prosecution related to the guilt phase of the trial. Porterfield, 746 S.W.2d at 450. The court concluded therefore that the prosecution's statement did not foreclose the possibility that the photographs would be used in the sentencing phase. Id. Petitioner has failed to establish how the state court's decision was either contrary to or an unreasonable application of federal law. See Porterfield Order I at 53 (holding that Porterfield failed to establish a violation of federal law with respect to the prosecution's oral stipulation). Accordingly, the Court grants Respondent's motion for summary judgment as to Claim 16.

R.   **Claim 17 - The Prosecution's Opening Statement And Closing Argument At Sentencing Violated The Sixth, Eighth, And Fourteenth Amendments.**

Petitioner asserts that certain statements and arguments offered by the prosecution during its opening and closing statements were constitutionally prohibited. Specifically, during its opening remarks, the prosecution allegedly implied that the defense had the duty to prove mitigation. The prosecution also purportedly asserted in its closing statement that executing Petitioner would deter others from committing murder, despite the fact that no evidence was presented during the trial to support that proposition.

A review of the record indicates that Petitioner failed to raise these claims in the state courts. Porterfield raised these issues in the state court proceedings, however, Petitioner did not adopt by reference this portion of Porterfield's brief. See Addendum 7 at 2 (Petitioner's direct appeal brief adopting by reference issues I, II, III, IV, VI, XV, XVII, and XIX from Porterfield's direct appeal brief); see also Addendum 8 at 3 (Porterfield's direct appeal brief asserting in issue XVI that prosecutor's opening and closing statements contained improper arguments). Petitioner maintains that ineffective assistance of counsel establishes cause to overcome this default.

In order to utilize a claim of ineffective assistance of counsel to establish cause, the claim of ineffective assistance

89

itself must have been exhausted in the state courts.  <u>See</u> <u>Edwards</u>, 529 U.S. at 452-53.  In the state court proceedings, Petitioner's claims of ineffective assistance of counsel included allegations that counsel failed to: (1) adequately investigate for mitigation evidence; (2) properly request expert services; (3) request investigative assistance; (4) appropriately manage the trial testimony of Dr. West; (5) request a continuance when the State failed to comply with the notice provisions regarding aggravating circumstances; (6) object to the murder for hire aggravating circumstance, (i)(4), as double enhancement; (7) object to the vicarious application of the heinous, atrocious, and cruel aggravating factor; and (8) request a clarifying instruction regarding intent to inflict serious physical abuse in the (i)(5) aggravating circumstance.  <u>See</u> <u>Owens</u>, 13 S.W.3d at 749.

Petitioner did not present the state courts with a claim of ineffective assistance of counsel based on counsel's failure to raise a claim of improper statements by the prosecution during the opening and closing remarks.  The Court finds therefore that Petitioner has not established cause to overcome her default. Accordingly, the claim is defaulted because Petitioner failed to exhaust her state remedies and is now barred by the Tennessee post-conviction statute from doing so.  The Court grants Respondent's motion for summary judgment as to Claim 17.

S.   **Claim 18 –   The Trial Court's Sentencing Stage Instructions Violated The Sixth, Eighth, And Fourteenth Amendments.**

Petitioner asserts that the jury instructions given during the sentencing phase resulted in numerous constitutional violations. She maintains that the trial court's instructions were unconstitutional because they 1) equated reasonable doubt with moral certainty; 2) indicated that a life sentence requires a unanimous verdict; 3) did not instruct that if the jury could not unanimously agree on a sentence, then Petitioner would automatically be sentenced to life; 4) could have been interpreted as requiring the jury to unanimously find mitigating circumstances; 5) failed to instruct the jury that it had to conclude that Petitioner intended to have the victim die a heinous, atrocious, or cruel death in order to find the HAC aggravating circumstance; 6) failed to instruct the jury that it could sentence Petitioner to life imprisonment even if it sentenced Porterfield to death; and 7) instructed the jury that it should not let sympathy affect its judgment.   Petitioner also contends that the trial court erred because it did not instruct the jury that it was to presume that a life sentence would result in a lifetime of imprisonment after a prospective juror stated in group voir dire that a life sentence does not result in such.

The sentencing instructions given by the trial court provided that

91

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty is not demanded by the law but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the verdict.

Addendum 5 at 39. The trial court also instructed the jury that

If you unanimously determine that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proven by the State, beyond a reasonable doubt, and said circumstances are not outweighed by any mitigating circumstance, the sentence shall be death.

The jury shall state, in writing, the statutory aggravating circumstance or statutory aggravating circumstances so-found and signify, in writing, that there were no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstance or circumstances so-found.

You will write your findings and verdict upon the enclosed forms attached hereto and made a part of this charge. Your verdict shall be as follows:

(1) We, the jury, unanimously find the following listed statutory aggravating circumstance or circumstances: The jury will then list the statutory aggravating circumstance or circumstances so-found beyond a reasonable doubt.

(2) We, the jury, unanimously find that there are no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstance or circumstances so listed above.

92

> (3) Therefore, we, the jury, unanimously find
> that the punishment shall be death.
>
> The verdict must be unanimous, and each juror
> must sign their name beneath the verdict.

Id. A finding of life imprisonment was then explained in the jury instructions:

> If you unanimously determine that no statutory
> aggravating circumstance has been proven by
> the state, beyond a reasonable doubt; or if
> the jury unanimously determined that a
> statutory aggravating circumstance or
> circumstances have been proved by the state,
> beyond a reasonable doubt, but that the said
> statutory aggravating circumstance or
> circumstances are outweighed by one or more
> mitigating circumstances, the sentence shall
> be life imprisonment. You will write your
> verdict upon the enclosed form attached hereto
> and made a part of this charge.
>
> The verdict should be as follows: We, the
> jury, unanimously find that the punishment
> shall be life imprisonment.
>
> The verdict must be unanimous and signed by
> each juror. The juror, in no case, should
> have sympathy or prejudice or allow anything
> but the law and evidence to have any influence
> upon them in determining their verdict. They
> should render their verdict with absolute
> fairness and impartiality as they think truth
> and justice dictate.

Id. at 42-44.

During post-conviction proceedings, Petitioner asserted that the sentencing phase jury instructions were given in error because they equated reasonable doubt to moral certainty. As discussed in Claim 15, the Tennessee Court of Criminal Appeals held that the "reasonable doubt" jury instruction given during the sentencing and

guilt phases did not fall below the requirements of the Due Process Clause. See Owens, 13 S.W.3d at 765. In so holding, the Court of Criminal Appeals noted that such instructions have been upheld on numerous occasions. Id. Among the cases relied upon by the court was Austin, 126 F.3d at 846-47, in which the Sixth Circuit ruled that such a "reasonable doubt" instruction did not lower the constitutional burden of proof.

The reasonable doubt jury instruction at issue in this case is virtually identical to the one at issue in Austin. This Court reiterates, therefore, that the decision of the Court of Criminal Appeals was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court; nor were the Tennessee court's factual determinations unreasonable. See 28 U.S.C. § 2254(d). Accordingly, the Court grants Respondent's motion for summary judgment as to Claim 18, concerning whether the reasonable doubt jury instruction given during the sentencing stage resulted in a constitutional violation.

Petitioner next asserts that the jury instructions are unconstitutional because they indicated that a life sentence requires a unanimous verdict, and the jury was not instructed as to the effect of its inability to unanimously agree on a verdict. Additionally, Petitioner submits that the sentencing phase instructions could have been interpreted as requiring the jury to

unanimously find mitigating circumstances.  On post-conviction appeal, the court of criminal appeals summarily rejected each of these arguments. See Owens, 13 S.W.3d at 766. The court concluded that "these [i]ssues have been repeatedly rejected by [the Tennessee Supreme Court]." Id.

In Coe, 161 F.3d 320 (6th Cir. 1998), the Sixth Circuit considered the issues presented by Petitioner concerning the requirements and perceived requirements of unanimity in jury deliberations.[16]  In Coe, the Court examined whether jury instructions similar to those at issue were unconstitutional because the jurors were not told that Coe would receive a life sentence if they failed to reach a unanimous verdict.[17] Coe, 161 F.3d at 339.  The court determined that the jury instructions were constitutionally sound despite the fact that the jury was given incomplete information.  Id. at 340.  In so deciding, the court reasoned that "it does not necessarily mislead a jury regarding its role to avoid disclosing what will happen if the jury fails to achieve unanimity." Id.  Furthermore, the court noted that "the very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves."

---

[16]     The Court recognizes that Coe was a pre-AEDPA case.  The adoption of the AEDPA, however, does not implicate the holdings made by the Coe court with respect to the issues raised by Petitioner concerning unanimity in the sentencing phase jury instructions.

[17]     The sentencing phase jury instructions given in Coe are virtually identical to those given to the jury in the instant action with the only differences being stylistic. See Coe, 161 F.3d at 336-37.

Id. (quoting Lowenfield v. Phelps, 484 U.S. 231 (1988)). Accordingly, the failure of the trial court to instruct the jury concerning its inability to reach a unanimous verdict did not unconstitutionally "deceive the jury and infect the verdict with unreliability." Id.

Moreover, in Jones v. United States, 527 U.S. 373 (1999), the Supreme Court held that the Constitution does not require that a jury in every capital case be instructed as to the consequences of a breakdown in the deliberative process. Jones, 527 U.S. at 382-83. The Jones court additionally noted that various federal courts of appeals have rejected a constitutional unanimity requirement or a requirement of a jury instruction as to the import of a less than unanimous verdict. Id. at 382, n.6. This Court concludes therefore that non-unanimity jury instructions are not required in capital cases nor must the jury be instructed as to the result should they fail to reach a unanimous verdict. The state court's determination that the sentencing phase jury instructions did not violate Petitioner's constitutional rights is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Accordingly, the Court grants Respondent's motion for summary judgment as to Petitioner's assertions in Claim 18 that the sentencing phase jury instructions which instructed the jury that it must unanimously agree to a life sentence but did not explain to

96

the   jury   the   effect   of   a   non-unanimous   verdict   are
unconstitutional.

Owens next contends that the sentencing phase instructions are
unconstitutional because the jury could have interpreted them as
requiring a unanimous finding as to mitigating circumstances.  In
Coe, the Sixth Circuit considered whether jury instructions similar
to those at issue in this case were unconstitutional.  Coe, 161
F.3d at 337.  The Coe court determined that such instructions do
not violate Mills v. Maryland, 486 U.S. 367, 373-75 (1988), which
held that in reviewing the constitutionality of such instructions,
the   proper   inquiry   is   whether   a   reasonable   jury   might   have
interpreted   the   instruction   in   a   way   that   is   constitutionally
impermissible.  Coe, 161 F.3d at 337.  The Coe court reasoned that
the jury instructions "require[d] unanimity as to the results of
the weighing, but this [was] a far different matter than requiring
unanimity as to the presence of a mitigating factor."  Id. at 338
(emphasis in original).  Accordingly, the court concluded that
nothing in the language of the jury instructions could reasonably
be taken to require unanimity as to the presence of a mitigating
factor.   Id.   Given the similarity in the sentencing phase
instructions in Coe and in this case, the Court concludes that the
state court's decision was not an unreasonable application of
federal law as determined by the United States Supreme Court.
Accordingly, the Court grants Respondent's motion for summary

judgment of Claim 18 relating to the perceived unanimity requirement in finding mitigating circumstances.

Petitioner next asserts that the sentencing stage instructions were unconstitutional because they failed to instruct the jury that it had to find that Petitioner intended to have the victim die a heinous, atrocious, or cruel death in order to impose the HAC aggravating circumstance.

Respondent states that Petitioner's only assertion of error as to the HAC aggravator was that "trial counsel was constitutionally ineffective under the Sixth Amendment to the United States Constitution and Article I, § 9 of the Tennessee Constitution for not challenging the HAC instructions as applied to Ms. Owens." See Addendum 14 at 68; Addendum 18 at 8. A review of the record, however, indicates that Petitioner challenged the application of the HAC aggravator to her case during post-conviction proceedings. See Addendum No. 14 at 63-69; Addendum 18 at 1-8.

When considering Petitioner's HAC aggravator claim, the Tennessee Court of Criminal Appeals determined that Owens waived the claim because she failed to raise it on direct appeal. See Owens, 13 S.W.3d at 761. Nevertheless, the court proceeded to address the issue of the vicarious application of the HAC aggravator to Owens' case on the merits. Id. Petitioner asserts therefore that the claim is not procedurally defaulted.

It is unclear whether the appellate court denied Petitioner

98

post-conviction relief on this claim based on waiver or based on its analysis of the issue.  For this reason, the Court finds that it may consider her claim.

Petitioner in short argues that the Constitution prohibits the imposition of capital punishment based on the conduct of an accomplice, and the trial court should have therefore instructed the jury that a finding of intent was required as to the HAC aggravator.  She maintains that because there is no proof to establish that she directed Porterfield to kill Mr. Owens by bludgeoning him to death, Porterfield's acts cannot be attributed to her.

The state court considered Petitioner's claim in view of Enmund v. Florida, 458 U.S. 782 (1982), and Tison v. Arizona, 481 U.S. 137 (1987).  The state court initially noted that in Enmund, the United States Supreme Court held that  a non-participating accomplice, in other words, a non-triggerman could not receive the death penalty.  Owens, 13 S.W.3d at 760.  The state court further recognized Enmund's holding that "[t]he focus must be on [the defendant's personal] culpability, not on that of those who committed the robbery and shot the victims, for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence.'"  Id. (quoting Enmund, 458 U.S. at 798 (internal citations omitted)).

The state court then turned to Tison in which the Supreme

99

Court considered another felony murder case based upon accomplice
liability.   The appellate court noted that Tison "refined the
Enmund intent rule and held that 'major participation in the felony
committed, combined with reckless indifference to human life'
demonstrated culpability sufficient for execution." Id. (quoting
Tison, 481 U.S. at 158).   Thus, Tison made many defendants
convicted of felony murder, both triggermen and non-triggermen,
death eligible. Owens, 13 S.W.3d at 760.

The Tennessee court determined that, despite the holding in
Tison, the issue of the vicarious application of aggravating
circumstances had not been addressed. Id. at 761; but see State v.
Tison, 129 Ariz. 526, 633 P.2d 335, 354 (1981), cert. denied, 459
U.S. 882 (1982)(death penalty affirmed to nontriggerman where
"heinous   atrocious   cruel"   and   pecuniary   gain   aggravating
circumstances applied vicariously).   The appellate court found that
the "Enmund-Tison holding addresses only whether a non-triggerman
may be sentenced to death; it does not address whether the conduct
of the triggerman may be used to aggravate the sentence of the
non-triggerman." Owens, 13 S.W.3d at 760.   The court therefore
determined it was necessary to consider the issue given that the
United State Supreme Court had not addressed it.   Id.

In assessing the issue, the state court initially noted that
no Tennessee case had previously decided "whether a convicted
murderer, who took no part in the killing itself and was unaware as

100

to how it was to be accomplished, [could] be sentenced to death based upon the 'heinous, atrocious, and cruel' aggravating circumstance."[18]  Id.  The court determined that the Tennessee Supreme Court, although not directly ruling on the issue, had implicitly upheld the vicarious application of the HAC aggravator. Id.  The court then concluded that a non-triggerman defendant can be held vicariously liable for an aggravating circumstance following an Enmund-Tison determination.  Id. at 762.[19]

In so doing, the state court noted the decisions of other federal and state courts which had considered the issue.  Id.; see, e.g., White v. Wainwright, 809 F.2d 1478, 1485 (11th Cir. 1987) (death penalty upheld based upon vicarious application of heinous, atrocious cruel factor since defendant was armed and on scene as active participant in robbery); Ex parte Bankhead, 585 So. 2d 112, 125 (Ala. 1991) ("heinous atrocious cruel" aggravating circumstance upheld based on manner of killing and not on defendant's actual participation); Haney v. State, 603 So. 2d 368, 380-381, 385-387 (Ala. Crim. App. 1991) (appellant admitted paying co-defendant to

---

[18]     In other words, the question remained of "whether an aggravating factor may be applied vicariously to a defendant if he was not the actor responsible for the particular aggravating circumstance," even though a defendant may be death eligible following a determination of "major participation combined with reckless indifference to human life" under Enmund-Tison.  Owens, 13 S.W.3d at 761.

[19]     As noted in Owens Order I, the Tennessee Supreme Court has now adopted the holding of the court of criminal appeals in Owens, holding that the HAC aggravating circumstance may be vicariously applied to a co-defendant who is not responsible for the manner of death of the victim.  See Owens Order I at 16-17; State v. Robinson, 146 S.W.3d 469, 500 (Tenn. 2004).

kill her husband and giving him instructions on how to approach her home without being observed); <u>Fox v. State</u>, 779 P.2d 562, 578 (Okla. Crim. App. 1989)(death penalty supported by evidence that defendant armed himself with shotgun and shells before robbing grocery store with co-defendant where three people were killed).

The state court then considered the facts of the case as applied to Owens in making its <u>Enmund-Tison</u> determination.  In finding that Petitioner was death eligible under <u>Enmund-Tison</u>, the court concluded that

> [t]he appellant willingly and knowingly associated herself with others for the purpose of effecting a premeditated murder upon her husband resulting in his heinous, atrocious, and cruel death.  The proof gleaned from her confession and testimony of eyewitnesses demonstrated that she repeatedly gave several men large sums of money to effectuate that criminal purpose.  She supplied these men with photographs of her husband, his car, and their home, as well as a diagram of his parking space at work.  Moreover, she personally drove her co-defendant by her home and her church ordering him to make the crime appear to be a burglary/robbery.  She gave her co-defendant a key to her house, met with him the afternoon of the murder, and went to church with her husband that evening.  The appellant refused to allow her children to remain at church with their father to play basketball that evening; she took them to her sister's home and played games in order for the murder to occur.  Upon her later arrival at her home, despite obvious signs of the crime, she allowed her children to enter into the house to find their murdered father.  This proof evinces the appellant's participation combined with reckless indifference.  Accordingly, the appellant is death eligible under <u>Enmund-Tison</u>.

<u>Id.</u>

The court went on to state that

> eligibility for capital punishment via vicarious

liability, however, is not absolute; rather, it is subject to statutory limitations. Tennessee has chosen to constitutionally narrow the class of death eligible defendants by statutorily enumerating a number of specific aggravating circumstances and expressly requiring the finding of at least one aggravating circumstance beyond a reasonable doubt before the death penalty can be imposed. See Tenn. Code Ann. § 39-2-203(g) (1982); see also Middlebrooks, 840 S.W.2d at 344. [footnote omitted]. In the present case, the State must prove that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," Tenn. Code Ann. § 39-2-203(i)(5) (emphasis added), in order to establish the presence of the aggravating circumstance at issue. The plain language of this provision, "read in context of the entire statute, without any forced or subtle construction which would extend or limit its meaning," State v. Cauthern, 967 S.W.2d 726, 735 (Tenn. 1998); cert. denied, 525 U.S. 967, 119 S. Ct. 414, 142 L. Ed. 2d 336 (1998) see also State v. Johnson, 970 S.W.2d 500, 505 (Tenn. Crim. App. 1996), perm. to appeal denied, (Tenn. 1997), clearly focuses on the murder itself and not the defendant's own actions or intent. Cf. State v. Hall, 976 S.W.2d 121, 134 (Tenn. 1998), cert. denied, 526 U.S. 1989, 119 S. Ct. 1501, 143 L. Ed.2d 654 (1999)(plain language of (i)(8) aggravator, during defendant's escape from lawful custody, adhered to in construing legislative intent). After examination of this issue, we conclude that it was the legislature's intent that the (i)(5) aggravator impute liability upon a defendant for conduct for which he or she is criminally responsible. This aggravator, by its plain language, clearly encompasses consideration of the nature and circumstances of the crime itself, which would permit such a vicarious application. [footnote omitted] Cf. Ex parte Bankhead, 585 So. 2d at 125 ('heinous atrocious cruel' aggravating circumstance upheld based on the manner of killing and not on defendant's actual participation). The emphasis in the (i)(5) aggravator is on the manner of killing, not on the defendant's actual participation. When the defendant contracts for another to commit murder and that murder is committed in a heinous, atrocious, and cruel manner, we conclude that this aggravator may appropriately be applied in imposing a sentence of death. We hold that the factual application of the heinous, atrocious, and cruel aggravating circumstance is supported by the proof in this case. This issue is

103

without merit.

Id. at 762-63.

The state court's ruling does not conflict with Enmund, 458 U.S. 782 or Tison, 481 U.S. 137.  Moreover, the court's determination that the HAC aggravator may be applied vicariously if supported by an Enmund-Tison determination is not an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States.  The trial court therefore was not required to instruct the jury that a finding of intent was required.  Accordingly, the Court grants Respondent's motion for summary judgment as to this claim.

Petitioner next asserts that the trial court erred by failing to instruct the jury that it could sentence her to life imprisonment even if it sentenced Porterfield to death.  A review of the record indicates that Petitioner failed to raise this claim in the state courts.  Moreover, she did not adopt by reference any portion of Porterfield's brief which raised this issue.  Petitioner has not established cause to overcome her default.  Accordingly, the claim is defaulted because Petitioner failed to exhaust her state remedies and is now barred by the Tennessee post-conviction statute from doing so.  The Court therefore grants Respondent's motion for summary judgment as to this claim.

Owens further contends that the trial court violated the Constitution by instructing the jury that it should not let

104

sympathy affect its judgment.  Respondent asserts that this claim was procedurally defaulted because it was not presented in the state courts.  Petitioner relies on Porterfield's appellate brief to establish that she exhausted this issue in the state courts. She did adopt by reference parts of Porterfield's brief, however, Issue XVIII pertaining to the "sympathy" jury instruction was not adopted by Petitioner. See Addendum 8 at 36-37.  Furthermore, the Tennessee Supreme Court discussed the "sympathy" jury instruction issue in reference to Porterfield's claim. See Porterfield, 746 S.W.2d at 450.  The Court concludes therefore that Petitioner failed to exhaust this claim in the state court proceedings and is now barred by Tennessee's post-conviction statute of limitations and waiver provisions from asserting this claim.  Petitioner has procedurally defaulted this issue, and the Court may not consider its merits on habeas review.  Accordingly, the Court grants Respondent's motion for summary judgment as to the trial court's "sympathy" jury instruction in claim 18.

Petitioner next insists that the trial court erred by failing to instruct the jury that it was to presume that a life sentence meant a life imprisonment after a prospective juror stated in group voir dire that a life sentence did not result in such imprisonment. Respondent maintains that Petitioner procedurally defaulted this claim.  Relying on her post-conviction briefs, Petitioner argues that she exhausted this claim in the state courts.  Specifically,

105

she maintains that portions of these briefs, which assert that "jurors hold misconceptions about the imposition of the death penalty, including the mistaken belief that a person sentenced to a life prison term does not spend the rest of her life in prison," resulted in the exhaustion of this claim. See Addendum 14 at 87; Addendum 18 at 99.

The Court concludes that Petitioner did not exhaust this claim in the state courts. The context in which this argument was presented to the state courts indicates that Petitioner was challenging her inability to present proof regarding parole eligibility and challenging the constitutionality of the death penalty in general based on certain juror misconceptions. See Addendum 14 at 86-90; Addendum 18 at 98-100. Furthermore, when addressing Petitioner's argument concerning parole eligibility for a sentence of life imprisonment, the court of criminal appeals discussed it in relationship to the constitutionality of the death penalty. See Owens, 13 S.W.3d at 765-66. Petitioner did not assert that the trial court erred by failing to instruct the jury that it was to presume that a life sentence would result in a lifetime of imprisonment. Accordingly, the Court finds that Petitioner failed to exhaust this claim in the state courts and is now barred by Tennessee's post-conviction statute of limitations and waiver provisions from asserting it. She has procedurally defaulted this claim, and the Court may not consider its merits on

106

habeas review.  The Court therefore grants Respondent's motion for summary judgment as to Petitioner's claim that the trial court erred by failing to instruct the jury as to parole eligibility for those sentenced to life.

### T.   Claim 20- The Tennessee Supreme Court Violated The Sixth, Eighth, And Fourteenth Amendments By Conducting A Proportionality Review With An Incomplete Rule 12 Form.

Petitioner asserts that the Tennessee Supreme Court relied on an incomplete Rule 12 report to conduct its proportionality review in violation of the Constitution.  Petitioner admits that she failed to raise this issue during post-conviction proceedings.  See Traverse at 8.  The Court concludes that Petitioner did not exhaust this claim in the state courts and is now barred by Tennessee's post-conviction statute of limitations and waiver provisions from asserting it.  Therefore, Petitioner has procedurally defaulted this contention, and the Court may not consider its merits on habeas review.  Accordingly, the Court grants Respondent's motion for summary judgment as to Claim 20.

### U.   Claim 21- The Process That Resulted In Petitioner's Death Sentence Violated The Sixth, Eighth, And Fourteenth Amendment.

Owens claims that the proportionality review conducted by the Tennessee Supreme Court was inadequate.  Petitioner admits that she did not present evidence concerning the alleged inadequacy of the proportionality review during post-conviction proceedings.  The Court concludes therefore that she failed to exhaust this claim in

the state courts and is now barred by Tennessee's post-conviction statute of limitations and waiver provisions from asserting this claim.  Petitioner has procedurally defaulted this claim, and the Court may not consider its merits on habeas review.  Accordingly, the Court grants Respondent's motion for summary judgment as to Claim 21, ¶ 178.

### V.   Claim 22- Petitioner's Death Sentence Violates The Eighth And Fourteenth Amendments.

Petitioner asserts that her death sentence violates the Eighth and Fourteenth Amendments because it is the product of Porterfield's decision not to plead guilty, a process over which Owens had no control.  As noted *supra*, the State offered Petitioner and Porterfield life sentences in return for pleas of guilty.  The State's offer, however, was contingent upon both defendants pleading guilty.  Respondent maintains that Petitioner has procedurally defaulted this claim because the only issue that Petitioner raised in the state courts concerning her inability to plead guilty was related to the trial court's failure to grant a severance motion.

To establish that she did not procedurally default the claim, Petitioner relies on her direct appeal brief which provides in pertinent part that

> *simple due process* dictates that in a capital case when a situation arises as in the instant case, that a co-defendant be allowed to be severed and accept a life sentence.  If not, such failure to sever allows a co-defendant to

108

> dictate whether or not another co-defendant
> may be exposed to the ultimate punishment.
> Such procedure, appellant respectfully
> submits, violates *due process of law*.

Addendum 7 at 8 (emphasis added).[20]  Petitioner asserts that by using the term "due process," she raised a claim of a violation of the Fourteenth Amendment.  Furthermore, she argues that her usage of the phrase "simple due process . . . in a capital case" implied a claim based on the Eighth and Fourteenth Amendments.  In conclusion, Petitioner contends that she asserted a violation of the Eighth Amendment by arguing that the trial court erred in failing to grant a severance resulting in her inability to accept the State's plea offer, which in turn, allowed Porterfield to dictate whether she would be exposed to a sentence of death.

The Court must determine whether this excerpt of Petitioner's direct appeal brief "fairly presented" to the state courts the substance of Petitioner's Eighth and Fourteenth Amendment claims related to Porterfield's decision to proceed to trial.  A federal claim is not "fairly presented" simply because all the facts necessary to support it were presented to the state court or because the constitutional claim appears self-evident.  Haggins v. Warden, Fort Pillow State Farm, 715 F.2d 1050, 1054 (6th Cir. 1983).

---

[20]   The issue, as styled in Petitioner's direct appeal brief, was "THE COURT A [sic] ERRED IN REFUSING TO SEVER THE APPELLANT FROM THE CO-DEFENDANT'S CASE AND ALLOWING HER TO PLEAD GUILTY AND ACCEPT A LIFE SENTENCE."  Addendum 7 at 6.   The brief continues to discuss how the proof elicited in Porterfield's case had a prejudicial "spill over" effect on Petitioner's case resulting in the imposition of the death penalty.  Id. at 7-8.

Instead, the petitioner must have asserted both the factual and legal basis for her claim to the state courts. <u>Franklin v. Rose</u>, 811 F.2d 322, 325 (6th Cir. 1987). A state defendant may be deemed to have "fairly presented" a claim to the state courts, if she (1) relied upon federal cases employing constitutional analysis; (2) relied upon state cases employing federal constitutional analysis in like fact situations; (3) phrased the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleged facts well within the mainstream of constitutional law. <u>Id.</u> at 326. "General allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated." <u>McMeans v. Brigano</u>, 228 F.3d 674, 681 (6th Cir. 2000) (citing <u>Petrucelli v. Coombe</u>, 735 F.2d 684, 688-89 (2d Cir. 1984)).

Applying the <u>Franklin</u> criteria, the Court finds that Petitioner did not sufficiently assert a claim of a violation of the Eighth and Fourteenth Amendments based on the arbitrary imposition of the death penalty on Petitioner in light of Porterfield's decision not to plead guilty. First, Petitioner did not rely upon federal cases employing constitutional analysis of the Eighth or Fourteenth Amendments in support of her claim. The only decisions cited by Petitioner in support of her claim were state law cases. <u>See</u> Addendum 7 at 7 (citing <u>Seaton v. State</u>, 472

110

S.W.2d 905 (Tenn. Crim. App. 1971); <u>Arrington v. State</u>, 548 S.W.2d
314 (Tenn. Crim. App. 1976)). Moreover, the state law cases listed
by Petitioner simply discuss the propriety of severance and of
granting a severance to force a plea. Furthermore, the state
cases do not employ federal constitutional analysis of the Eighth
or Fourteenth Amendments in like fact situations. Petitioner did
include in her brief the phrases "due process" and "simple due
process . . . in a capital case" in the concluding paragraph
discussing Petitioner's claim of error. Although these are
constitutional law phrases, a general reference like "due process"
alone does not "fairly present" a claim that specific
constitutional rights were violated. Likewise, the brief excerpt
is not sufficiently particular to allege a denial of a specific
constitutional right. The discussion is couched in terms of the
trial court's failure to grant a severance, not in terms of the
arbitrariness of the death penalty based on Porterfield's decision.

Finally, the claim does not allege facts well within the
mainstream of constitutional law. Courts have long recognized that
the Eighth Amendment requires that a sentence of death must not be
given arbitrarily or capriciously. <u>See</u> <u>Furman v. Georgia</u>, 408 U.S.
238 (1972). A defendant's inability to make a plea based on a co-
defendant's decision not to make such plea, however, cannot be said
to be facts found within the mainstream of Eighth Amendment's
requirement that a sentence of death not be arbitrary. This is

especially true when, as here, the facts and argument centered around the trial court's alleged errors in failing to sever Petitioner's case from Porterfield's and in denying her request that the State in effect be required to accept Petitioner's plea of guilty.

The Court concludes therefore that Petitioner failed to provide the legal basis for her claim to the state courts.  As such, the Court finds that Petitioner failed to exhaust this claim in the state courts and is now barred by Tennessee's post-conviction statute of limitations and waiver provisions from asserting this claim.  Accordingly, Petitioner has procedurally defaulted this issue, and the Court may not consider its merits on habeas review.[21]  Respondent's motion for summary judgment of Claim 22 is granted.

**W.   Claim 23- The Tennessee Death Penalty Statute And The Death Penalty Itself Violate The Eighth And Fourteenth Amendments.**

Petitioner advances three arguments in favor of her claims that the Tennessee Death Penalty Statute and the death penalty itself are unconstitutional.  The Court will consider each argument in turn.  First, she asserts that the Tennessee Death Penalty

---

[21]     The Court notes that absent a finding that Petitioner procedurally defaulted Claim 22, Petitioner's claim likely would not have prevailed because a federal habeas court generally may not announce and grant retroactive application to new rules of constitutional criminal procedure. E.g., Saffle v. Parks, 494 U.S. 484 (1990); Teague v. Lane, 489 U.S. 288 (1989).  The State did not raise the Teague argument, however, and this Court is not required to consider it *sua sponte*.  Lyons v. Stovall, 188 F.3d 327, 338-39 (6th Cir. 1999).

Statute unconstitutionally precludes the sentencing jury from knowing that a non-unanimous verdict results in a life sentence. On post-conviction, the state court determined that the Tennessee Supreme Court has routinely rejected this claim. See Owens, 13 S.W.3d at 766 (citing State v. Smith, 857 S.W.2d 1 (Tenn. 1993) (holding that the Constitution does not prohibit or require a trial court to inform a capital sentencing jury of relevant and accurate sentencing information)).

In Jones, 527 U.S. 373, the Supreme Court has held that the Constitution does not require that a jury in every capital case be instructed as to the consequences of a breakdown in the deliberative process. Jones, 527 U.S. at 382–83. Accordingly, the state court's decision that the Tennessee Death Penalty Statute is not unconstitutional because the jury is prevented from knowing that a non-unanimous verdict results in a sentence of life is neither contrary to nor an unreasonable application of federal law.

Petitioner next contends that the death penalty is unconstitutional because 1) it cannot be applied with consistency, given that the Constitution requires individualized sentencing, and 2) the prosecution cannot establish that a sentence of death is the least intrusive means of accomplishing a compelling State interest.

Petitioner failed to present these claims to the state courts. She maintains that ineffective assistance of counsel provides cause sufficient to excuse the procedural default. In order to utilize

a claim of ineffective assistance of counsel to establish cause, the claim of ineffective assistance itself must have been exhausted in the state courts.  See Edwards, 529 U.S. at 452-53.  Petitioner did not present the state courts with a claim of ineffective assistance of counsel based on counsel's failure to raise and perfect on appeal these arguments related to the constitutionality of the death penalty.  Petitioner therefore has not established cause to overcome her failure to exhaust her state remedies.  As such, this Court may not review the procedurally defaulted claim. The Court thereby grants Respondent's motion for summary judgment of Claim 23.

## X.   Claim 24 - Petitioner Received Ineffective Assistance Of Counsel In Violation Of The Sixth, Eighth, And Fourteenth Amendments.

Petitioner asserts that she received ineffective assistance of counsel based on counsel's failure to assert at trial or on appeal that 1) sex discrimination occurred in the selection of the grand jury foreperson, 2) under representation of African-Americans on the panels from which prospective jurors were drawn resulted from discrimination against African-Americans, 3) the prosecution used its peremptory challenges in a discriminatory manner, 4) the decisions of the trial court to strike for cause prospective juror Dorothy A. Newberry and not to strike for cause Rhea E. Benson and Richard F. Piersing were unconstitutional, and 5) the prosecution improperly stated to the jury that it was the duty of the defense

114

to present mitigating evidence and that the death penalty is a deterrent. Respondent maintains that Petitioner procedurally defaulted these claims.

None of Owens' allegations of ineffective assistance of counsel include any of the grounds advanced by Petitioner in Claim 24 of her habeas petition. Accordingly, the Court finds that Petitioner failed to exhaust this claim in the state courts and is now barred by Tennessee's post-conviction statute of limitations and waiver provisions from asserting it. The claim is therefore procedurally defaulted, and the Court may not consider its merits on habeas review. The Court thereby grants Respondent's motion for summary judgment of Claim 24.

**Y.   Claim 25 - Petitioner's Conviction Violates The Sixth, Eighth, And Fourteenth Amendments Should It Be Determined That Porterfield Did Not Murder Mr. Owens Or That Porterfield's Conviction Is Unconstitutional.**

Petitioner asserts that if the district court concludes that Porterfield did not kill Mr. Owens or that Porterfield's conviction is unconstitutional, an essential element of the crime for which Petitioner was convicted would be negated. Petitioner failed to exhaust this claim in the state courts and is now barred from presenting the claim by Tennessee's post-conviction statute of limitations and waiver provisions. The contention is therefore procedurally defaulted, and the Court may not consider its merits on habeas review. The Court thereby grants Respondent's motion for

115

summary judgment of Claim 25.

### Z. Claim 26 – The Cumulative Effect Of Constitutional Error Is Not Harmless Should The Court Find More Than One Constitutional Error Harmless.

Owens claims that, should this Court determine that there are two or more Constitutional errors which are harmless, the cumulative effect of such errors results in Constitutional error warranting the grant of writ. Petitioner failed to assert a claim of the cumulative effect of error in the state court proceedings. Accordingly, Petitioner did not exhaust this claim in the state courts and its consideration is now barred by Tennessee's post-conviction statute of limitations and waiver provisions. The claim is therefore procedurally defaulted, and the Court may not consider its merits on habeas review. The Court thereby grants Respondent's motion for summary judgment of Claim 26.

### V. CONCLUSION

For the reasons stated herein, the Court hereby grants Respondent's motion for summary judgment as to Claims 1-18; 20; 21, ¶ 178; and 22-26. Respondent's and Petitioner's motions for summary judgment concerning Claims 19 and 21, ¶ 177, were addressed in a prior order. See Owens Order I.

116

**IT IS SO ORDERED** this ___23rd___ day of June, 2005.


 

 

 

_____

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 78 in
case 2:00-CV-02765 was distributed by fax, mail, or direct printing on
June 23, 2005 to the parties listed.

---

Alice B. Lustre
ATTORNEY GENERAL OFFICE
425 5th Avenue North
Nashville, TN 37243--049

Robert L. Hutton
GLANKLER BROWN, PLLC
One Commerce Square
Suite 1700
Memphis, TN 38103

Christopher M. Minton
ASSISTANT FEDERAL PUBLIC DEFENDER
810 Broadway
Ste. 200
Nashville, TN 37243

Honorable J. Breen
US DISTRICT COURT